UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, <br><br> *Plaintiffs,* <br><br> v. <br><br> THE TALIBAN, AL-QAEDA, <br> and THE HAQQANI NETWORK, <br><br> *Defendants.* | Misc Action No. 1:21-MC-00110-DLF |

**RESPONSE IN OPPOSITION TO THE INTERNATIONAL MONETARY FUND'S MOTION TO QUASH SERVICE OF PROCESS**

Plaintiffs, John Does 1 though 7, hereby respond to the International Monetary Fund's ("IMF") Motion to Quash Service of Process ("Motion") (DE 14) and supporting Memorandum (DE 14-1).

This is a simple matter of the adjudication of a Writ of Attachment that was properly served and thereby perfected against assets eligible to satisfy the underlying judgment.

The IMF makes two arguments against the normal adjudication of the writ: 1) that its Articles of Agreement "are a treaty", and as such create an "absolute immunity" from judicial process;[1] and 2) that neither the TRIA nor the International Organizations Immunities Act ("IOIA") abrogate its immunity.[2]

The IMF is mistaken. The Articles of Agreement are not a treaty, but rather have force in law due to a statute, specifically the Bretton Woods Agreement Act ("BWAA"), which gave the immunities contained in the Articles the force of law in the United States. The statutory

---

[1] Memorandum, p. 2.
[2] *Id*. at p. 8.

1

immunities provided through the BWAA, as well those provided in the IOIA, can, of course, be impacted or amended by another United States Statute.  In the wake of the September 11 attacks, the Terrorism Risk Insurance Act ("TRIA") was enacted to allow for collection of the blocked assets of terrorist judgment debtors or their agencies or instrumentalities *notwithstanding any other provision of law*.  TRIA undoubtedly overrode all existing immunities in the narrow class of cases to which it applies.  The Motion claiming absolute immunity is groundless.

**I.      Background Facts**

    A.      The IMF, its immunities, and their foundations

        1.      The IMF'S Articles incorporated into U.S. law

On July 31, 1945, the Bretton Woods Agreement Act, 22 U.S.C. § 286 *et seq.*, was passed, authorizing the President to accept membership into the IMF according to its Articles of Agreement, which had been drafted at that time but not yet signed by member states.  22 U.S.C. § 286.  The Articles of Agreement of the IMF were accepted by the United States and other member states on December 27, 1945.  According to 22 U.S.C. § 286h, the provisions of article IX, sections 2 to 9 concerning immunities have full force and effect in the United States.  Article IX, Section 3 provides:

> *Immunity from judicial process.* The Fund, its property and its assets, wherever located and by whomsoever held, shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity for the purpose of any proceedings or by the terms of any contract.

Articles of Agreement, Art. IX, Section 3.

        2.      The IOIA

On December 29, 1945, the IOIA, 22 U.S.C. § 288 *et seq.*, was signed into law.  It defined the term "international organization" and authorized the President to designate organizations that would be entitled to the immunities contained in the Act.  On July 11, 1946,

2

President Harry S. Truman issued Executive Order 9751, thereby designating the IMF as a public international organization.

### 3. 28 U.S.C. § 1611

On October 21, 1976, 28 U.S.C. §§ 1610 and 1611 were signed into law. Section 1610 concerns "Exceptions to the immunity from attachment or execution". Section 1611 specifies "Certain types of property immune from execution"; it provides in relevant part:

> Notwithstanding the provisions of section 1610 of this chapter [28 USCS § 1610], the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

28 U.S.C. § 1611(a).

### B. The blocking of Defendants in this matter

The President of the United States has authority to "block" property of individuals and entities pursuant to the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. 1701 *et seq*.).

On Sept 23, 2001, President George W. Bush, acting pursuant to IEEPA, promulgated Executive Order ("EO") 13224, which blocked "all property and interests in property" of individuals and entities listed in its Annex, or of foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. The original Annex listed Al-Qaeda.

On July 2, 2002, President George W. Bush, again acting pursuant to IEEPA, promulgated EO 13268, specifically amending the EO 13224 Annex by adding the Taliban.

On September 12, 2012, Secretary of State Hillary Rodham Clinton, acting pursuant to Executive Order 13224, and thus pursuant to IEEPA, determined the Haqqani Network committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States, thereby causing its property and interests in property to be blocked.

### C. The Terrorism Risk Insurance Act abrogates immunities to allow for collection of blocked assets of terrorist judgment debtors, or their agencies and instrumentalities

On July 26, 2002, the Terrorism Risk Insurance Act ("TRIA") (28 U.S.C. § 1610, note), was signed into law to address the difficulty of collecting judgments against terrorists by removing immunities, and by providing a source of collection:  the pool of assets blocked pursuant to IEEPA and the Trading with the Enemies Act.  TRIA provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610, note.  It defined "blocked assets" as follows:

> (2) Blocked asset. The term 'blocked asset' means—
> (A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or under sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702); and
> (B) does not include property that—
> (i) is subject to a license issued by the United States Government for final payment, transfer, or disposition by or to a person subject to the jurisdiction of the

>United States in connection with a transaction for which the issuance of such license has been specifically required by statute other than the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) or the United Nations Participation Act of 1945 (22 U.S.C. 287 *et seq*.); or
>(ii) in the case of property subject to the Vienna Convention on Diplomatic Relations or the Vienna Convention on Consular Relations, or that enjoys equivalent privileges and immunities under the law of the United States, is being used exclusively for diplomatic or consular purposes.

28 U.S.C. § 1610, note.

### D.    The terrorist attack, lawsuit, and judgment

On January 4, 2016, the Taliban, Al-Qaeda, and the Haqqani Network, acting in concert, executed a massive bomb attack in Kabul, Afghanistan injuring Plaintiffs, John Does 1 though 7, who were in Afghanistan working for a U.S. Government contractor.

Plaintiffs brought suit against the terrorists, and on November 5, 2020, were awarded $138 million dollars for their injuries.  *See* Final Default Judgment, *John Does 1 through 7 v. the Taliban, et al.,* No. 20-00605 (N.D. Texas Nov. 5, 2020), (Dkt. No. 22).

### E.    The Taliban takes over Afghanistan and Da Afghanistan Bank, and the U.S. blocks assets that were set to be delivered to the Taliban

On or around August 15, 2021, the Taliban, with the aid of the Haqqani Network, took control of Afghanistan.  News Desk, *A Historical Timeline of Afghanistan*, PBS NEWS HOUR, https://www.pbs.org/newshour/politics/asia-jan-june11-timeline-afghanistan.

Soon thereafter, the Taliban took control of Da Afghanistan Bank, installing a new governor.  Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief With Crisis Looming*, BLOOMBERG, August 23, 2021, https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-as-crisis-looms.[3]

---

[3] Since then, the newly installed Board of Directors for Da Afghanistan Bank has met a number of times amongst themselves and with representatives of countries such as Pakistan, Turkey, Iran, Azerbaijan, and Kyrgyzstan at the behest of the Taliban, clearly demonstrating the

At the time of the Taliban takeover of Afghanistan, the IMF was set to distribute to Da Afghanistan Bank assets worth $400,000,000 the following week, that is, on August 23, 2021. According to an article in the Wall Street Journal:

> In addition to the funding from the opium trade and extortion schemes that fuel Taliban operations, the group thought it was positioned to inherit a large amount of cash from the International Monetary Fund next week. . . .
>
> . . . Over the past six months, the fund has gone through a complicated process to approve an allocation of SDRs worth roughly $650 billion to its 190 member countries.
>
> Per the agreement, the Taliban would have received the equivalent of over $400 million from the IMF.
>
> It was possible, though difficult due to sanctions, that the Taliban could have found eager partners in Russia and China to help them convert the claims to cash after they are allocated on Aug. 23.

Lipsky, Josh and Wechsler, William F., WALL STREET JOURNAL, August 18. 2021, *The IMF Acts Against the Taliban --Afghanistan was in line to receive more than $400 million in Special Drawing Rights next week*, https://www.wsj.com/articles/biden-imf-taliban-funding-afghanistan-central-bank-withdrawal-terrorist-financing-islamist-11629320770, *see also* Rappeport, Alan, THE NEW YORK TIMES, *The World Bank is freezing aid disbursements to Afghanistan*, August 24, 2021, https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html, ("The decision follows a move by the International Monetary Fund last week to freeze the

---

Taliban's ownership and control of Da Afghanistan Bank.  *See generally* Da Afghanistan Bank, https://www.dab.gov.af/. *See also* Mpoya, *ECO Trade And Development Bank Held 91st Meeting Of Its Board Of Directors*, DA AFGHANISTAN BANK, https://www.dab.gov.af/eco-trade-and-development-bank-held-91st-meeting-its-board-directors; Mpoya, *Third Meeting on TTs*, DA AFGHANISTAN BANK, https://www.dab.gov.af/third-meeting-tts; Mpoya, *Efforts For Improving And Strengthening The Banking Sector Of The Country*, DA AFGHANISTAN BANK, https://www.dab.gov.af/efforts-improving-and-strengthening-banking-sector-country

distribution of more than $400 million in emergency currency reserves that were allocated to Afghanistan . . . ".).

But prior to that, on Sunday, August 15, the United States Government moved to freeze the assets of Da Afghanistan Bank. The Washington Post reported:

> The Biden administration on Sunday froze Afghan government reserves held in U.S. bank accounts, blocking the Taliban from accessing billions of dollars held in U.S. institutions, according to two people familiar with the matter.
>
> \*\*\*
>
> An administration official said in a statement, "Any central-bank assets the Afghan government have in the United States will not be made available to the Taliban."

*See* Stein, Jeff, *Biden administration freezes billions of dollars in Afghan reserves, depriving Taliban of cash*, THE WASHINGTON POST, August 17, 2021, https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

### F. Plaintiffs register their judgment, obtain a Writ of Execution, and perfect their Writ against assets held by the IMF on September 23, 2021

On August 20, 2021, Plaintiffs registered their judgment in this district. DE 1. On September 17, 2020, the Clerk of this Court issued a Writ of Attachment on Judgment other than Wages, Salary and Commissions (the "Writ") requiring the IMF "to hold and not to pay or surrender" the assets it held of any defendant, that is the Taliban, Al-Qaeda, or the Haqqani Network, "or the agency or instrumentality of the Defendant as defined by Section 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note, including but not limited to Da Afghanistan Bank." *See* Writ attached hereto as Exhibit A. The Writ further contained the standard "INTEROGATORIES IN ATTACHMENT". *Id*. The Writ announced that the attachment was made pursuant to the Terrorism Risk Insurance Act, 28 U.S.C.S. § 1610 note ("TRIA"), and further announced that "[i]f you fail to answer the Interogatories, judgment may

7

be entered against you for the entire amount of the plaintiff's claim and costs [Title 16, Section 526(b).  D.C. Code 1981 ed.]."

On September 23, 2021, Plaintiffs served the Writ on the IMF (*see* DE 4, Affidavit of Process Server), thereby establishing a lien over any assets of the Taliban, Al-Qaeda, the Haqqani Network, or any of their agencies or instrumentalities, including Da Afghanistan Bank, as the Writ specifically stated.

> **G.     The IMF fails to properly respond to the Writ, but a motion it filed after its deadline is considered by the Court to be a motion to quash**

Rather than timely respond to the Writ, which announced that the attachment was made pursuant to The Terrorism Risk Insurance Act, 28 U.S.C.S. § 1610 note ("TRIA"), the IMF ignored it.[4]  Only after Plaintiffs filed a motion for the entry of judgment against it, on October 12, 2021 (DE 6), did the IMF file a notice, titled "Praecipe" (DE 8).  On November 1, 2021, it filed its Motion to Dismiss (DE 14), which this Court later deemed a Motion to Quash.[5]

---

[4] While the method of service was clearly appropriate, if the IMF wished to challenge the method of service or claim immunity, the proper course would have been to challenge the service in district court, not simply ignore the service.  *See Novak v. World Bank*, 227 U.S. App. D.C. 83, 703 F.2d 1305, 1310 (1983) (reversing district court's dismissal of claim against World Bank, and stating "the World Bank, if it claimed service was improper, should have contested the validity of service and asserted that it was not amenable to suit in the district court, as, indeed, it asserted in appellant's prior actions.")

[5] On November 10, 2021, the Court issued a Minute Order stating that it will construe the IMF's Motion to Dismiss (DE 14) as a Motion to Quash Service of Process and ordered Plaintiffs to respond to it on or before November 29, 2021.

H.     **The Motion to Quash**

In the Memorandum, the IMF argues: 1) that its Articles of Agreement are a "treaty", and as such create an "absolute immunity" from judicial process; and 3) that neither TRIA nor IOIA[6] abrogates its immunity.  These arguments fail.

II.     <u>**Argument**</u>

A.     **The IBRD is not immune**

1.     **The IMF Articles of Agreement are not a treaty**

The Bretton Woods Agreement is not a treaty.  It was not made by the Executive and concurred to by two thirds of the Senate, as provided in Article II, Clause 2 of the Constitution. Even the cite provided as authority for the statement by the IMF (*see* Memorandum, p. 2) leaves no doubt as to the status of the Bretton Woods Agreement.  It is titled: "INTERNATIONAL AGREEMENTS *OTHER THAN* TREATIES".  60 Stat. 1401; 2 UNTS 39 (emphasis added).[7]

Rather, the Bretton Woods Agreement is merely an international agreement.  It became the law of the land based solely on its passage into law and codification in the Unites States Code, specifically through the Bretton Woods Agreement Act, 22 U.S.C. § 286h.  Had Congress

---

[6] Plaintiffs do not argue that IOIA abrogates the IMF's immunity contained in its Articles; rather, as will be shown, TRIA abrogates all of the bases of IMF's immunity, including those contained in its Articles, IOIA, and in 28 U.S.C. § 1611.

[7] By its own language, article IX, concerning immunities, required adoption by statute within member states to become law in those states.  It provides:

> Section 10.  Application of Article
> Each member shall take such action as is necessary in its own territories for the purpose of making effective in terms of its own law the principles set forth in this Article and shall inform the Fund of the detailed action which it has taken.

Art. IX, Section 10.

not passed the Bretton Woods Agreement Act, the Articles would not carry the force of law in the United States.

The IMF's entire argument, which is based on the belief that its Articles carry the force of law superior to a U.S. Statute, is thus baseless. The immunity is a statutory immunity that was granted by Congress, and which, therefore, can be overridden by a statute passed by Congress.

### 2. TRIA overrides all prior immunities

As the only Court to address the specific question logically held, TRIA overrides any prior-enacted provision of law that would prevent execution of a judgment against the assets of a terrorist judgment debtor for a claim based upon an act of terrorism. *See Weininger v. Castro*, 462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) ("TRIA, which was enacted later in time than [28 U.S.C.] § 1611, overrides the immunity conferred in § 1611"). TRIA clearly provides for execution or attachment "notwithstanding *any* other provision of law", including immunities. TRIA, Section 201(a), (emphasis added). Indeed, the intent of the "notwithstanding" language in TRIA is "to target statutory exceptions to immunity". *Id.* at 498; *quoting United States v. Holy Land Found. For Relief & Dev.*, 445 F.3d 771, 787 (5th Cir. 2006). TRIA leaves no doubt that Congress intended to, and did, override all prior grants of immunity so that collection can be had against those holding assets of terrorist judgment debtors when it authorized those collections "notwithstanding any other provision of law".

TRIA was signed into law on November 26, 2002. The immunities provided for in Article IX, Section 3 of the IMF's Articles of Agreement became effective in U.S. law pursuant to prior-enacted statutory section, 22 U.S.C. § 286h, when the Articles were accepted by the United States on December 27, 1945. (Although the IMF does not rely on the IOIA or 28, U.S.C. § 1611(a), they both also predate TRIA. The IOIA was passed on December 29, 1945,

10

and the IMF was designated as a public international organization entitled to enjoy the IOIA's immunities on July 1, 1946.  Section 1611(a) of Title 28 became law on October 21, 1976.)[8]

Because all of its potential sources of its immunity were overridden by TRIA, the IMF is not immune from this TRIA collection effort.  Its immunities were overridden for that narrow band of cases concerning collection of judgments against terrorist states and other terrorist parties, for which TRIA provided an exception to immunity.

### 3. The IMF's additional purported avoidances of TRIA lack all substance

#### a. That TRIA only applies to immunities contained in the FSIA

The IMF would have the Court believe that TRIA only overrides the immunities of foreign states contained within the Foreign Sovereign Immunities Act, *i.e.*, that TRIA only provides an exception to FSIA immunity.  Memorandum, p. 9.  But TRIA explicitly applies to more than foreign states – it applies "*in every case* in which a person has obtained a judgment *against a terrorist party* on a claim based upon an act of terrorism".  28 U.S.C. 1610, note (emphasis added).  It does not state that collection can be had, "notwithstanding any other provision in this Section" or "notwithstanding any other provision in the FSIA".  It reads, "notwithstanding *any other provision of law* . . . ".  *Id.*  (emphasis added).  Had Congress intended to limit the override of immunities to those codified in the FSIA, or to limit the exceptions only to foreign states, it would have so stated.[9]  That it did not compels the conclusion that TRIA overrides the immunities both generally enjoyed by the IMF and other

---

[8] The IMF concedes that the immunities contained in the Foreign Sovereign Immunities Act, such as the immunity provision in 28 U.S.C. § 1611, were overridden by TRIA.
[9] The Supreme Court has stated time and again "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

11

International Organizations pursuant to the IOIA, and those the IMF enjoys pursuant to its Articles, which have the force of law pursuant to their codification at 22 U.S.C. § 286h.  This simple conclusion is wholly consistent with the entire rationale of TRIA – to allow the victims of terrorism to collect against the blocked assets of terrorists, and to overcome the impediments they faced.

### b. That the IMF is not aware of any prior TRIA collections against international organizations

The IMF next argues that it is not aware of any application of TRIA to an international organization, as opposed to a foreign state.  Memorandum, p. 9.  That is not surprising.  It is indeed rare that the IMF or any international organization would hold blocked assets of an agency or instrumentality of a terrorist judgment debtor.  A series of exceptional circumstances had to occur before an international organization came into the crosshairs of a TRIA collection.  Plaintiffs first had to get a judgment against the Taliban, Al-Qaeda, and the Haqqani Network – bringing into existence a terrorist judgment debtor; then, after a 20-year war, judgment debtors the Taliban and Haqqani Network, had to take over Afghanistan and Da Afghanistan Bank, the Central Bank of Afghanistan, installing a new chief and thereby making it their agency or instrumentality; and then the IMF had to freeze the assets that were to be delivered to Da Afghanistan Bank the following week to prevent them from reaching the Taliban and the Haqqani Network.  Through this remarkable set of events, the IMF came to be holding the blocked assets of an agency or instrumentality of terrorist judgment debtors.  A rare exception to the statutory immunity the IMF normally enjoys thus presented itself.  The law is clear in this situation – the immunity is overcome.  The fact that it never happened before is meaningless.  Arguing that a TRIA collection has never been made against an international organization is the

logical equivalent of arguing that someone from Peoria has never been charged with treason. It does not mean that one couldn't.

### c.     That the IMF's functioning would suffer

The IMF argues that broad immunity is necessary for its functioning. Memorandum, p. 6. But the heavens will not fall if the IMF has to relinquish money to the victims of the Taliban, the Haqqani Network and Al-Qaeda, rather than give it to an entity controlled by the Taliban and the Haqqani Network, namely Da Afghanistan Bank. To the contrary. The countervailing good of sanctioning terrorism and compensating victims would suffer if the assets are not delivered to the Plaintiffs. And, if the international community wants to provide more funds to an entity controlled by the Taliban, it can, but only after these victims who have perfected a writ against blocked assets are compensated.

It is worth noting that Congress, in enacting TRIA, did not open up the IMF to liability on its own right. Rather, through this and any TRIA collection, the IMF would only have to surrender assets that belong to an agency or instrumentality of a terrorist judgment debtor. Only the assets that would flow to the Taliban and the Haqqani Network, through the Afghan central bank they now control, are at issue.

### d.     That the Plaintiffs request repeal by implication

Finally, the IMF argues that to accept Plaintiffs' interpretation is to adopt a disfavored repeal by implication. Memorandum, p. 10. There was, of course, nothing implied in the language of TRIA. It is explicit. Its specific application in "every" case of a judgment against a "terrorist party", along with the "notwithstanding any other provision of law" clause, leave no doubt that the explicit intention of Congress was to override any prior immunities.

### III.     Conclusion

**Wherefore**, Plaintiffs/Judgment Creditors respectfully request that this Court enter an order denying the Motion to Quash, and for what other relief the Court deems just and proper.

Dated:  November 29, 2021.

>                                    Respectfully submitted,
>
>                                    **do Campo & Thornton, P.A.**
>                                    Chase Bank Building
>                                    150 S.E. 2nd Avenue, Ste. 602
>                                    Miami, Florida 33131
>                                    Telephone: (305) 358-6600
>                                    Facsimile: (305) 358-6601
>
>                                    By:    s/ *John Thornton*
>                                           John Thornton
>                                           DC Bar No. 980680
>                                           jt@dandtlaw.com

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  Further, a copy of the foregoing was mailed to: Da Afghanistan Bank, Ibina-Sina Watt. Kabul, Afghanistan.  No service is required on Defendants the Taliban, Al-Qaeda, and the Haqqani Network, which are in default for failing to appear. *See* Fed. R. Civ. P. 5(a)(2).

>                                    s/ *John Thornton*
>                                    John Thornton