UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOES 1 THROUGH 7, | |
| *Plaintiffs,* | |
| v. | Misc Action No. 1:21-MC-00110-DLF |
| THE TALIBAN, AL-QAEDA,<br>and THE HAQQANI NETWORK, | |
| *Defendants.* | |

## RESPONSE IN OPPOSITION TO INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT'S MOTION TO QUASH WRIT OF ATTACHMENT

Plaintiffs, John Does 1 though 7, hereby respond to the International Bank for Reconstruction and Development's ("IBRD") Motion to Quash Writ of Attachment (DE 19).

This is a simple matter of the adjudication of a Writ of Attachment that was properly served and thereby perfected against assets eligible to satisfy the underlying judgment.

The IBRD's claims of absolute immunity (IBRD's Argument I) are groundless. The statutory immunities it relies on were clearly overridden by a subsequent statute applicable in this unique collection against a terrorist judgment debtor.

The IBRD's claim that Plaintiffs have failed to prove a TRIA claim (Argument II) are belied by the fact that OFAC, after the service of the Writ, issued a license to release these very funds to the Taliban, revealing that they are, in fact, blocked assets of the Taliban and that they will either be released to the Taliban, or to the Plaintiffs. (Of course, any license issued after the writ has been perfected has no impact on the funds secured by the writ.)

1

The IBRD's argument that service of a post-judgment writ such as this one must be effectuated by a marshal (Argument III) is, in a word, wrong.  The statute requiring service by marshal applies to pre-judgment writs of attachment, not post-judgment writs of attachment.

**I.      Background Facts**

**A.      The IBRD, its immunities, and their foundations**

**1.      The IBRD'S Articles incorporated into U.S. law**

On July 31, 1945, the Bretton Woods Agreement Act, 22 U.S.C. § 286 *et seq*. was passed, authorizing the President to accept membership into the International Bank for Reconstruction and Development according to its Articles of Agreement, which had been drafted at that time but not yet signed by member states.  22 U.S.C. § 286.  The Articles of Agreement of the IBRD were signed by the United States and other member states on December 27, 1945.  According to 22 U.S.C. § 286h, the provisions of article VII, sections 2 to 9, including sections 3 and 4 concerning immunities, have full force and effect in the United States from the date of acceptance.  The scope of those immunities extends only to the assets of the IBRD, not assets it might hold of other entities.  Article VII, sections 3 and 4, the sections concerning immunities, provide:

> **SECTION 3. Position of the Bank with Regard to Judicial Process**
> Actions may be brought against the Bank only in a court of competent jurisdiction in the territories of a member in which the Bank has an office, has appointed an agent for the purpose of accepting service or notice of process, or has issued or guaranteed securities. No actions shall, however, be brought by members or persons acting for or deriving claims from members. The property and assets of the Bank shall, wheresoever located and by whomsoever held, be immune from all forms of seizure, attachment or execution before the delivery of final judgment against the Bank.

> **SECTION 4. Immunity of Assets from Seizure**
> Property and assets of the Bank, wherever located and by whomsoever held, shall be immune from search, requisition, confiscation, expropriation or any other form of seizure by executive or legislative action.

### 2. The IOIA

On December 29, 1945, the International Organizations Immunities Act ("IOIA"), 22 U.S.C. § 288 *et seq*., was signed into law.  It defined the term "international organization", and authorized the President to designate organizations that would be entitled to the immunities contained in the Act.  On July 11, 1946, President Harry S. Truman issued Executive Order 9751, thereby designating the IBRD as a public international organization.

### 3. 28 U.S.C. § 1611

On October 21, 1976, 28 U.S.C. §§ 1610 and 1611 were signed into law.  Section 1610 concerns "Exceptions to the immunity from attachment or execution". Section 1611 specifies "Certain types of property immune from execution"; it provides in relevant part:

> Notwithstanding the provisions of section 1610 of this chapter [28 USCS § 1610], the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

28 U.S.C. § 1611(a).

### B. The blocking of Defendants in this matter

The President of the United States has authority to "block" property of individuals and entities pursuant to the International Emergency Economic Powers Act ("IEEPA") (50 U.S.C. 1701 *et seq*.).

On Sept 23, 2001, President George W. Bush, acting pursuant to IEEPA, promulgated Executive Order ("EO") 13224, which blocked "all property and interests in property" of individuals and entities listed in its Annex, or of foreign persons determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to have

committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States. The original Annex listed Al-Qaeda.

On July 2, 2002, President George W. Bush, again acting pursuant to IEEPA, promulgated EO 13268, specifically amending the EO 13224 Annex by adding the Taliban.

On September 12, 2012, Secretary of State Hillary Rodham Clinton, acting pursuant to Executive Order 13224, and thus pursuant to IEEPA, determined the Haqqani Network committed, or posed a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national security, foreign policy, or economy of the United States, thereby causing its property and interests in property to be blocked.

### C. The Terrorism Risk Insurance Act abrogates immunities to allow for collection of blocked assets of terrorist judgment debtors, or their agencies and instrumentalities

On July 26, 2002, the Terrorism Risk Insurance Act ("TRIA") (28 U.S.C. § 1610, note), was signed into law to address the difficulty of collecting judgments against terrorists by removing immunities, and by providing a source of collection: the pool of assets blocked pursuant to IEEPA and the Trading with the Enemies Act. It provides:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

28 U.S.C. § 1610, note. It defined "blocked assets" as follows:

> (2) Blocked asset. The term 'blocked asset' means—

(A) any asset seized or frozen by the United States under section 5(b) of the
Trading With the Enemy Act (50 U.S.C. App. 5(b) [50 USCS § 4305(b)]) or
under sections 202 and 203 of the International Emergency Economic Powers Act
(50 U.S.C. 1701; 1702); and
(B) does not include property that—
(i) is subject to a license issued by the United States Government for final
payment, transfer, or disposition by or to a person subject to the jurisdiction of the
United States in connection with a transaction for which the issuance of such
license has been specifically required by statute other than the International
Emergency Economic Powers Act (50 U.S.C. 1701 *et seq*.) or the United Nations
Participation Act of 1945 (22 U.S.C. 287 *et seq*.); or
(ii) in the case of property subject to the Vienna Convention on Diplomatic
Relations or the Vienna Convention on Consular Relations, or that enjoys
equivalent privileges and immunities under the law of the United States, is being
used exclusively for diplomatic or consular purposes.

28 U.S.C. § 1610, note.

### D.    The terrorist attack, lawsuit, and judgment

On January 4, 2016 the Taliban, Al-Qaeda, and the Haqqani Network, acting in

conspiracy, executed a massive bomb attack in Kabul, Afghanistan injuring Plaintiffs, John Does

1 though 7, who were in Afghanistan working for a U.S. Government contractor.

Plaintiffs brought suit against the terrorists, and on November 5, 2020, were awarded

approximately $138 million for their injuries.  *See* Final Default Judgment, *John Does 1 through*

*7 v. the Taliban, et al.,* No. 20-00605 (N.D. Texas Nov. 5, 2020), (Dkt. No. 22).

### E.    The Taliban takes over Afghanistan, the U.S. freezes assets, and the IBRD
blocks an Afghan trust fund it administers

On or around August 15, 2021, the Taliban, with the aid of the Haqqani Network, took

control of and established itself as the government of Afghanistan.  News Desk, *A Historical*

*Timeline of Afghanistan*, PBS NEWS HOUR, https://www.pbs.org/newshour/politics/asia-jan-

june11-timeline-afghanistan.  Soon thereafter, the Taliban took control of Da Afghanistan Bank,

installing a new governor.  Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank*

*Chief With Crisis Looming*, BLOOMBERG, August 23, 2021,

https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-as-crisis-looms.

On August 15, the United States Government moved to freeze assets destined for Da Afghanistan Bank.  The Washington Post reported:

> The Biden administration on Sunday froze Afghan government reserves held in U.S. bank accounts, blocking the Taliban from accessing billions of dollars held in U.S. institutions, according to two people familiar with the matter.
>
> ***
>
> An administration official said in a statement, "Any central-bank assets the Afghan government have in the United States will not be made available to the Taliban."

*See* Jeff Stein, *Biden administration freezes billions of dollars in Afghan reserves, depriving Taliban of cash*, THE WASHINGTON POST, August 17, 2021, https://www.washingtonpost.com/us-policy/2021/08/17/treasury-taliban-money-afghanistan/.

On August 24, 2021, the IBRD announced that it had frozen aid disbursement and a "Trust Fund" for Afghanistan that it administers.  Rappeport, Alan, *The World Bank is freezing aid disbursements to Afghanistan*, THE NEW YORK TIMES (Aug. 24, 2021), https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html

### F.  Plaintiffs register their judgment, obtain a Writ of Execution, and perfect their Writ against assets held by the IBRD on September 23, 2021

On August 20, 2021, Plaintiffs registered their judgment in this district.  DE 1.  On September 17, 2020, the Clerk of this Court issued a Writ of Attachment on Judgment other than Wages, Salary and Commissions (the "Writ") requiring the IBRD "to hold and not to pay or surrender" the assets it held of any defendant, that is the Taliban, Al-Qaeda, or the Haqqani Network, "or the agency or instrumentality of the Defendant as defined by Section 201(a) of the Terrorism Risk Insurance Act of 2002, 28 U.S.C. § 1610 note, including but not limited to Da

Afghanistan Bank." *See* Writ attached hereto as Exhibit A and DE 5, Affidavit of Process

Server. The Writ further contained the standard "INTEROGATORIES IN ATTACHMENT".

*Id*. The Writ announced that the attachment was made pursuant to the Terrorism Risk Insurance

Act, 28 U.S.C.S. § 1610 note ("TRIA"), and further announced that "[i]f you fail to answer the

Interrogatories, judgment may be entered against you for the entire amount of the plaintiff's

claim and costs [Title 16, Section 526(b). D.C. Code 1981 ed.]."

On September 23, 2021, Plaintiffs served the Writ on the IBRD, thereby establishing a

lien over any assets of the Taliban, Al-Qaeda, the Haqqani Network, or any of their agencies or

instrumentalities, including Da Afghanistan Bank, as the Writ specifically stated. *See* Affidavit

of Process Server (DE 5).

### G. OFAC issues a license to the IBRD to release funds to the Taliban on September 24, 2021

Subsequently, on September 24, 2021, the U.S. Department of Treasury, Office of

Foreign Assets Control ("OFAC") issued General License No. 14 authorizing the World Bank to

engage in "all transactions involving the Taliban . . . that are ordinarily incident and necessary to

the provision of humanitarian assistance to Afghanistan or other activities that support basic

human needs in Afghanistan." General License No. 14, Department of the Treasury, Office of

Foreign Assets Control: *Authorizing Humanitarian Activities in Afghanistan* (September 24,

2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf.

### H. IBRD fails to properly respond to the Writ, but is later given the opportunity to file a motion to quash

On October 4, 2021, the IBRD filed a copy of the Writ, unanswered, along with a copy of

a letter it had sent to undersigned counsel. The letter requested undersigned counsel to withdraw

the writ on the grounds of the IBRD's general immunities.  The letter did not address the

Terrorism Risk Insurance Act or the license.  The filing was not docketed until October 22, 2021.

On October 29, 2021, the Court struck that filing and issued a minute order directing the

IBRD to file a response to the Motion for Judgment.  On November 10, 2021, the Court ordered

the IBRD to file a motion to quash by November 15, 2021.

### I.        The Motion to Quash

In its Motion to Quash (DE 19), the IBRD argues I) it is immune from service of process;

II) that even if TRIA has overridden its immunities, Plaintiffs have failed to prove a TRIA claim;

and III) Plaintiffs failed to properly serve the IBRD because they did not employ a marshal.  All

of these arguments fail.

### II.      Argument

### A.        The IBRD is not immune

### 1.        TRIA overrides all prior immunities

As the only Court to address the specific question logically held, TRIA overrides any

prior-enacted provision of law that would prevent execution of a judgment against the assets of a

terrorist judgment debtor for a claim based upon an act of terrorism.  *See Weininger v. Castro*,

462 F. Supp. 2d 457, 499 (S.D.N.Y. 2006) ("TRIA, which was enacted later in time than [28

U.S.C.] § 1611, overrides the immunity conferred in § 1611").  TRIA clearly provides for

execution or attachment "notwithstanding *any* other provision of law", including immunities.

TRIA, Section 201(a), (emphasis added).  Indeed, the intent of the "notwithstanding" language in

TRIA is "to target statutory exceptions to immunity".  *Id. at* 498 quoting *United States v. Holy

Land Found. For Relief & Dev*., 445 F.3d 771, 787 (5th Cir. 2006).  The Terrorism Risk

Insurance Act leaves no doubt that Congress intended to, and did, override all prior grants of

immunity so that collection can be had against those holding assets of terrorist judgment debtors when it authorized those collections "notwithstanding any other provision of law".

The IBRD claims that it benefits from three sources of immunity. All three of these, however, predate TRIA, and so were overridden by it. TRIA was signed into law on November 26, 2002. The immunities provided for in Article VII, sections 3 and 4 of the IBRD's Articles of Agreement, became effective in U.S. law pursuant to prior-enacted statutory section, 22 U.S.C. § 286h, when the Articles were signed by the United States on December 27, 1945. The IOIA was passed on December 29, 1945, and the IBRD was designated as a public international organization entitled to enjoy the IOIA's immunities on July 1, 1946. Section 1611(a) of Title 28 became law on October 21, 1976.[1]

Because the sole sources of its immunity were overridden by TRIA, the IBRD is not immune from this TRIA collection effort.

### 2.    TRIA is not limited to sovereigns

Perhaps recognizing that TRIA does indeed override prior immunities, the IBRD argues that

> the TRIA exception to immunity *applies only to foreign sovereigns*, and not, by
> its own terms, to international organizations. *See* TRIA § 201(a), 116 Stat. 2337,
> note following 28 U.S.C. § 1610.

Motion, p. 8, (emphasis added). That position appears to be invented from whole cloth. TRIA contains no such limitations. To the contrary, TRIA explicitly applies "*in every case* in which a person has obtained a judgment *against a terrorist party* on a claim based upon an act of

---

[1] Interestingly, the other garnishee before this Court, the IMF, argues that only the immunities contained in the Foreign Sovereign Immunities Act, such as the immunity provision in § 1611 invoked by the IBRD, were overridden. The IMF agrees with Plaintiffs that § 1611 was overridden by TRIA.

terrorism, *or* for which a terrorist party is not immune under section 1605A or 1605(a)(7)".  28 U.S.C. § 1610, note (emphasis added).  The statute clearly lays out two instances – when terrorist parties are subject to judgments, or when terrorist states are (pursuant to Section 1605A).  TRIA applies to "every case" that satisfies one of those two criteria.[2]  For when Congress said, "every case", it meant "every case".[3]  Here, it is not disputed that the judgment debtors are terrorist parties and that Plaintiffs' judgment is based upon an act of terrorism.  TRIA applies.

If there be any doubt, TRIA's definition of "terrorist party" encompasses non-state terrorists and terrorist organizations, in addition to state sponsors of terror:

> (4) Terrorist party. The term 'terrorist party' means a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), *or* a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j) [50 USCS § 4605(j)]) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371).

28 U.S.C.S. § 1610, note (emphasis added).

Undoubtedly, TRIA overrides all prior immunities, and applies regardless of whether the garnishee, or the judgment debtor, is a foreign state.

**B.      Plaintiffs do prove a TRIA claim**

**1.      The IBRD admits that it holds a "trust fund" that it blocked pursuant to the Taliban's designation (which was made pursuant to IEEPA), and thus was subject to TRIA at the time of the service of the writ**

---

[2] TRIA stands in stark contrast to another statutory section, which concerns any "judgment relating to a claim for which a *foreign state*" is not immune.  28 U.S.C. § 1610(f)(1)(A) (emphasis added).  Had Congress wanted to limit TRIA to apply only to foreign states, it would have said so, just as it did in § 1610(f)(1)(A).  Instead, it stated explicitly that it applies in *every* case of a judgment *against a terrorist party* on a claim based upon an act of terrorism.

[3] The Supreme Court has stated time and again "that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992).

The IBRD argues that Plaintiffs do not prove a TRIA claim.[4]  Motion p. 9.  It proceeds to make arguments to the effect that the requirements of TRIA have not been met.  But in so doing, it makes striking admissions.

First, the IBRD posits, and provides news stories and quotes from its website that confirm, that it administers a "Trust Fund", and that this fund and aid disbursements were frozen when the Taliban took over Afghanistan.  Motion, p. 9 quoting Rappeport, Alan, *The World Bank is freezing aid disbursements to Afghanistan*, THE NEW YORK TIMES (Aug. 24, 2021), https://www.nytimes.com/2021/08/24/world/asia/world-bank-afghanistan.html.  Its own website confirms it holds and administers this Trust Fund.  *See* The World Bank in Afghanistan*,* WORLD BANK, *https://www.worldbank.org/en/country/afghanistan/overview#1*.  ("The Bank-administered Afghanistan Reconstruction Trust Fund has raised more than $12.9 billion.").

Then it argues that the assets at issue are not "blocked assets" because, on September 24, 2021, OFAC issued General License 14 authorizing "transactions involving the Taliban".  Motion, p. 12.  It implies that this license removes the assets at issue from their block.

Of course, the OFAC license could only serve to allow the release of the assets to the Taliban if, in fact, they were the blocked assets of the Taliban or otherwise owed to the Taliban in the first place.  The IBRD confirms this to be the case by invoking the license.  If these assets were not "blocked assets" that, absent the block, would be withdrawn by or owed to the Taliban or its agency or instrumentality, then the IBRD would not be invoking the license as evidence of their release from the block.  The invocation of the license proves that they are.

---

[4] While Plaintiffs would be allowed to conduct discovery to "prove" their claim, here they already do, based in part on the admissions of the IBRD.

**2.      A license issued after the issuance of a writ is has no effect on a TRIA collection**

The IBRD's implied position is that a license issued subsequent to the service of a writ undoes the writ by changing the status of the assets from blocked to unblocked.  This interpretation flies in the face of the operation of writs, the jurisprudence concerning OFAC actions in TRIA cases, and the entire rationale of TRIA.

A writ acts as a lien. D.C. Code § 16-547 Retention of Property or Credits by garnishee, states:

> Where property or credits attached or sought to be attached are held by the garnishee in the name of or for the account of a person other than the defendant, the garnishee *shall retain* the property or credits during the period *pending determination by the Court* of the propriety of the attachment or the rightful owner of the property or credits.

(emphasis added).  Once it has attached, the judgment creditor has a valid lien on the debtor's property held by a garnishee.  *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d 191, 203 (D.D.C. 2011) ("Once the third-party holding the targeted property — the garnishee — is served with the writ, the judgment creditor has "a valid lien…on the debtor's property held by the garnishee.") (quoting *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1352 (D.C. 1994) (omission in original); *see also United States v. Sum of Three Hundred Nine Million Five Hundred Thousand Dollars*, 85 F. Supp. 3d 111, 116 (D.D.C. 2015). Lest there be any doubt that this non-controversial proposition applies to a TRIA execution in this district, this district has in fact held the same in a TRIA case.  *See Stansell v. Revolutionary Armed Forces of Colom*. (FARC), No. 10-471 (TJK), 2020 U.S. Dist. LEXIS 121498, at *5 (D.D.C. July 10, 2020) ("[s]ervice of the writ on the garnishee creates a valid lien in favor of the judgment creditor on the debtor's property held by the garnishee.")

Indeed, the relevant time for evaluating whether an asset is a "blocked asset" for TRIA purposes is when the writ is served.  The Eleventh Circuit confirmed this in a case involving a blocked individual who was later unblocked.  The Eleventh Circuit held that because "the writ of garnishment had been served on [the bank] before the delisting, the assets were still considered "blocked" for purposes of the… plaintiffs' turnover claim, notwithstanding the delisting decision." *Sutherlin v. Wells Fargo Bank N.A.*, 767 F. App'x 812, 821 (11th Cir. 2019).  That the assets were not "blocked assets" at some time later makes not a whit of difference.  Even the complete delisting of the blocked entity, as in *Sutherlin*, would not serve to undo the writ.

Attaching the same importance on timing of the service of the writ, but in a case in which the license had been issued *before* the judgment creditor had restrained the blocked assets with a writ, the Seventh Circuit concluded that that assets were not blocked.  It stated:

> By the time Appellees filed their initial, verified claims, *OFAC had already issued its license* and the funds had already been arrested to preserve them for forfeiture. In sum, the funds were no longer blocked.

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 627 (7th Cir. 2015) (emphasis added).  Likewise, in *United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677 (5th Cir. 2013), the Fifth Circuit looked to the date that the OFAC license was issued to determine whether the assets were collectable.  The case turned on the fact that "*OFAC issued this license four days before* the district court entered a civil judgment in favor of the Rubins against Hamas on September 27, 2004." *Id*. at 682 (emphasis added).  Clearly, the rule is that a license issued prior to the service of a writ serves to unblock assets for purposes of TRIA collections.   A subsequent license does not.

If there is any doubt as to whether the executive branch can defeat the standard judicial process of writ execution to thwart a TRIA collection by issuing a license after the fact of a writ

13

being perfected, TRIA's sponsor left no doubt that it cannot.  He declared unequivocally that

TRIA

> establishes once and for all, that such judgments are to be enforced against any
> assets available in the U.S., *and that the executive branch has no statutory
> authority to defeat such enforcement under standard judicial processes, except as
> expressly provided in this act.*

148 Cong. Rec. S11524, at S11528 (Nov. 19, 2002) (statement of Sen. Harkin) (emphasis

added).  Plaintiffs' timely service of the Writ cannot be defeated.

> **3.      The remainder of IBRD's objections to the application of TRIA is a
> smattering of non-sequiturs and erroneous arguments**

> **a.      That the IBRD has never provided funds to the Taliban**

First, oddly quoting newspaper accounts about its own operations, IBRD argues that "the

Taliban, has never been a recipient of a World Bank loan or grant or other financial resources

…".  Motion p. 9.  Of course, the Taliban only recently took over Afghanistan, and the funds that

would otherwise be paid to the central bank in Afghanistan, Da Afghanistan Bank, were frozen

at that time and for that reason.  Regardless, whether the IBRD held funds owed to the Taliban or

its agency or instrumentality prior to the Taliban's takeover of Afghanistan and Da Afghanistan

Bank is irrelevant.

> **b.      That the assets do not belong to a terrorist party**

The IBRD next argues that even if it held assets of Da Afghanistan Bank, that TRIA does

not apply.  It lays out a two-prong test:

> 1. the assets belong to the terrorist party; and
> 2. the assets are "blocked assets" within the meaning of TRIA.

Motion, p. 10.

The first prong, which mentions the "terrorist party" only, has a glaring omission.  TRIA

provides that "the blocked assets of that terrorist party *(including the blocked assets of any*

*agency or instrumentality of that terrorist party)* shall be subject to execution."  28 USC § 1610,

note (emphasis added).  *See also Weinstein v. Islamic Republic of Iran*, 609 F.3d 43, 49 (2d Cir.

2010) (holding that "the parenthetical language in Section 201(a) of the TRIA that permits

attachment of funds from agencies and instrumentalities would be rendered superfluous …" by

an interpretation that limited the collection to assets of the terrorist party alone.).

Further, the terms "agency" and "instrumentality" contained in that parenthetical are

broad.  A district court rightly employs "the plain and ordinary meaning" of these terms in the

TRIA context.  *Stansell v. Revolutionary Armed Forces of Columbia, 771 F.3d 713, 732* (11th

Cir. 2014).[5]  This is necessary "so that Congress's intent", which is to "deal comprehensively

with the problem of enforcement of judgments rendered on behalf of victims of terrorism", can

be carried out.  *Id*. (quoting *Hausler v. JP Morgan Chase Bank, N.A*., 740 F. Supp. 2d 525, 531

(S.D.N.Y. 2010)).  Under this plain and ordinary meaning standard, while a plaintiff must

present evidence sufficient to establish a relationship between the terrorist party and the

purported agency or instrumentality, that relationship may be indirect.  *Id*. at 742.

Indeed, TRIA collections regularly implicate related entities that have no formal

ownership or control of one another whatsoever.  *See Kirschenbaum v. 650 Fifth Ave.*, 830 F.3d

107, 133 (2d Cir. 2016) ("the text of the TRIA unambiguously reaches *more broadly* to permit

the attachment of property in circumstances not covered by the FSIA or FSIA immunity.")

(emphasis added);  *see also Weinstein*, 609 F.3d at 50;  *Rubin v. Islamic Republic of Iran*, 709

---

[5] As the Eleventh Circuit recognized, the definition of "agency or instrumentality of a foreign
state" contained in 28 U.S.C. § 1603(b) is inapplicable because, per subsection (b)(2), it is
limited to organs, subdivisions, or majority-owned corporations of foreign states, whereas TRIA
clearly provides that non-state judgment debtors are subject to TRIA execution.  *Id*. at 731.
Further, section (b)(3) disqualifies all foreign corporations, which would have the result of
"eviscerating TRIA's effectiveness vis-à-vis non-state terrorist organizations."  *Id*.  Thus, the
district court is correct to apply a standard different than the § 1603(b) standard

F.3d 49, 54 (1st Cir. 2013).  In *Kirschenbaum*, the Second Circuit used standard sources such as dictionaries to construe "agency" and "instrumentality," settling on three alternatives: that a defendant "was a means through which a material function…[wa]s accomplished," "provided material services to, on behalf of, or in support of," or "was owned, controlled, or directed by" a terrorist party.  *Id.* at 135.

Here, the Taliban took over Da Afghanistan Bank, removed the former head and installed a new one.  Eltaf Najafizada, *Taliban Name Obscure Official as Central Bank Chief With Crisis Looming*, BLOOMBERG, https://www.bloomberg.com/news/articles/2021-08-23/taliban-name-obscure-official-central-bank-chief-as-crisis-looms.  Since then, the newly installed Board of Directors for Da Afghanistan Bank has met a number of times amongst themselves and with representatives of countries such as Pakistan, Turkey, Iran, Azerbaijan, and Kyrgyzstan at the behest of the Taliban.  *See generally* Da Afghanistan Bank, https://www.dab.gov.af/. *See also* Mpoya, *ECO Trade And Development Bank Held 91st Meeting Of Its Board Of Directors*, DA AFGHANISTAN BANK, https://www.dab.gov.af/eco-trade-and-development-bank-held-91st-meeting-its-board-directors; Mpoya, *Third Meeting on TTs*, DA AFGHANISTAN BANK, https://www.dab.gov.af/third-meeting-tts; Mpoya, *Efforts For Improving And Strengthening The Banking Sector Of The Country*, DA AFGHANISTAN BANK, https://www.dab.gov.af/efforts-improving-and-strengthening-banking-sector-country.  As these actions clearly show, by any plain definition, the Taliban exercises ownership and control of Da Afghanistan Bank sufficient to make Da Afghanistan Bank qualify as the Taliban's agency or instrumentality under TRIA.

### c.  That the IBRD does not hold member funds

IBRD next argues that it disburses funds, rather than hold funds of members.  Motion, p. 10.  That position, however, is belied by its admission that it administers a "Trust Fund".

Assuming, however, that it did not hold such a "Trust Fund", the payment of funds can be garnished.  Accounts payable are regularly garnished.  And here, because IBRD admitted that assets would have flowed to Afghanistan, but were blocked, we know that assets were due to the Taliban.  Indeed, according to the World Bank, there were commitments for more than $784 million set for 2021.  Catherine Putz, *Taliban Takeover: World Bank and IMF Halt aid; US Freezes Afghan Assets*, THE DIPLOMAT (Nov 22, 2021, 9:44 AM), https://thediplomat.com/2021/08/taliban-takeover-world-bank-and-imf-halt-aid-us-freezes-afghan-assets/.

In the end, this Court's ruling will have one of two results.  Either $138 million, currently frozen, will flow to the Taliban, or it will flow to the victims of the Taliban.  TRIA was passed to dictate the result.

### d.       That the United States does not recognize the Taliban

The IBRD next argues that the United States does not recognize the assets as belonging to the Taliban because the United States has yet to recognize the Taliban as the Government of Afghanistan.  Motion p. 11.  Whether the Government has, as a diplomatic matter, recognized the Taliban as the legitimate government of Afghanistan is not the question for two reasons.  First, the assets do not have to belong to the Taliban, but rather an agency or instrumentality of the Taliban, in this case Da Afghanistan Bank.  Second, the diplomatic status of the Taliban has no bearing on whether it is able to own or control assets, or have agencies or instrumentalities that do.  Clearly, the Taliban controls assets, either directly or through Da Afghanistan Bank, which it controls.

More importantly, the United States clearly, in fact, *does* recognize the Taliban's ownership of the assets, as is evidenced by the license issued by OFAC the day after the service

of the Writ specifically authorizing the very assets held by IBRD to be released ***to the Taliban***. And, it is ironic that the IBRD would make the argument that the Taliban is illegitimate when, at the same time, it invokes its license to provide the funds ***to the Taliban.*** The IBRD's position is that it ought to be free to release blocked funds that are subject to a writ to the Taliban *because* the Taliban is illegitimate!

### C.    Plaintiffs properly served IBRD

In its final argument (Argument III), the IBRD alleges that plaintiffs failed to properly serve the Bank because Plaintiffs did not serve the Bank via the U.S. Marshal, but rather via process server. Motion, p. 12.  This argument is wrong.  Service of a writ of attachment in *pre-judgment* proceedings are governed by D.C. Code § 16-502, the section cited by the IBRD. Section 16-502 of the D.C. Code states: "A writ issued pursuant to *section 16-501* shall require the marshal to serve a notice on the defendant…" (emphasis added).  Section 16-501of the D.C. Code applies to "[a]ttachment *before* judgment; affidavit and bond." (emphasis added).[6]

Plaintiffs were not bound by this requirement, however, because in the instant case Plaintiffs served a writ of attachment *after* judgment in aid of execution.  The applicable statutes for writ of attachments in *post-judgment* proceedings are guided by D.C. Code Chapter 5 - Attachment and Garnishment, Subchapter II- Attachment and Garnishment After Judgment in Aid of Execution, D.C. Code §§ 16-541 – 16-556.  These sections do not require service of a writ of attachment by the U.S. Marshal, as illustrated by caselaw in this district evincing the non-controversial proposition that a post-judgment writ of attachment could be served via process server without the intervention of the U.S. Marshal.  *See Jerez v. Republic of Cuba,* 777 F. Supp.

---

[6] Section 16-501 (e) contains additional requirements for prejudgment attachment that are not requirements here, including the requirement of a bond in twice the amount of the claim. Subsection 501 obviously does not apply to post-judgment writs.

2d 6, 12 (D.D.C. 2011) ("Plaintiff filed a Notice of Service of Writ of Attachment on Judgment indicating that he had, through a *private process server*, served the Writ of Attachment on Judgment on the United States Department of Commerce") (emphasis added).  This stands to reason since in pre-judgment attachments the U.S. Marshal takes custody of the disputed property, whereas in the context of post-judgment collections the Garnishee retains "the property during the period pending determination by the Court of the propriety of the attachment or the rightful owner of the property." D.C. Code 16-547.  Both the requirement of service by marshal, and the aforementioned requirement of a bond, are not implicated in this case, as even a cursory review of the D.C. code reveals.[7]

### III.    Conclusion

The Motion to Quash should be denied.  By denying the Motion, the Court is in no way disturbing the operations of the IBRD or other international institutions.  It is a rare occurrence that IBRD hold blocked assets.  Further, because General License 14 has been issued, this collection will be a one-time occurrence.  IBRD will be able to make all future disbursements to the Taliban pursuant to the license.  The Court, by denying the Motion to Quash, will merely allow a legal process to properly proceed to its end of keeping some funds out of the terrorists' hands, and compensating their victims, exactly as Congress intended when it passed TRIA.

---

[7] The IBRD points out that Plaintiffs had prior cited "D.C. Code Section 16-501 et seq."  Motion, p. 12 at note 8.  Of course, by citing the entirety of Chapter 5, Attachment and Garnishment, of the D.C. Code, Plaintiffs did not thereby imply, or make it the case, that every subsection of it applies to this matter.

 **Wherefore**, Plaintiffs/Judgment Creditors respectfully request that this Court enter an order denying the Motion to Quash.

Dated:  November 29,  2021.

          Respectfully submitted,

          **do Campo & Thornton, P.A.**
          Chase Bank Building
          150 S.E. 2nd Avenue, Ste. 602
          Miami, Florida 33131
          Telephone: (305) 358-6600
          Facsimile: (305) 358-6601

          By:  s/ *John Thornton*
             John Thornton
             DC Bar No. 980680
             jt@dandtlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

 I HEREBY CERTIFY that on November 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  Further, a copy of the foregoing was mailed to: Da Afghanistan Bank, Ibina-Sina Watt. Kabul, Afghanistan.  No service is required on Defendants the Taliban, Al-Qaeda, and the Haqqani Network, which are in default for failing to appear. *See* Fed. R. Civ. P. 5(a)(2).

          s/ *John Thornton*
          John Thornton