**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| John Does 1 through 7, | |
| Plaintiffs, | |
| vs. | Misc Action No. 1:21-mc-00110-DLF |
| The Taliban, Al-Qaeda, and the Haqqani Network | |
| Defendants. | |

## INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT'S REPLY IN SUPPORT OF MOTION TO QUASH WRIT OF ATTACHMENT

Plaintiffs' Response (ECF No. 21) fails to remedy the core flaws in its Writ of Attachment identified by the International Bank for Reconstruction and Development's ("IBRD" or "Bank" or "World Bank") in its Motion to Quash ("Motion"): (1) the Bank and its assets are specifically immune from this type of suit, and the Terrorist Risk Insurance Act ("TRIA") does not override that immunity; (2) TRIA could not apply to the Bank because the Bank does not, and cannot, have "blocked assets" in this case; (3) and *were* the Bank to have blocked assets, those assets are not the property of the Taliban, or any of its instrumentalities or agencies. Because Plaintiffs cannot cure these fatal flaws, the World Bank is immune, and the Motion must be quashed. Plaintiff also has failed to properly serve the Bank under *any* standard, and the Court therefore lacks personal jurisdiction over the Bank.

### I.    The Bank and its Assets are Immune from this Enforcement Action

Plaintiffs have not disputed that the Bank and its assets are immune from suit and all forms of legal process (including service of process) absent a specified exemption or express

waiver. Plaintiffs instead rely solely on TRIA in their attempt to abrogate the Bank's immunity. As the Bank argued in its Motion, TRIA does not apply to the Bank, and even if it did, it cannot abrogate the Bank's immunity under either federal law *or* its Articles of Agreement. The FSIA grants foreign states, their agencies and instrumentalities jurisdictional immunity and immunity from attachment and enforcement in satisfaction of judgments against them, with few enumerated exceptions. FSIA exceptions to execution immunity are narrower than, and independent from, the exceptions to jurisdictional immunity. *Republic of Argentina v. NML Capital*, 573 U.S. 134, 142–43 (2014). For execution immunity, the FSIA provides that the property in the United States of a foreign state is immune from attachment or execution except as provided in §§ 1610 and 1611. 28 U.S.C. § 1609; *see also* 28 U.S.C. § 1610 (listing "Exceptions to the Immunity from Attachment or Execution"); *Letelier v. Republic of Chile*, 748 F.2d 790, 793 (2d Cir. 1984) ("[U]nder § 1609 foreign states are immune from execution upon judgments obtained against them, unless an exception set forth in §§ 1610 or 1611 of the FSIA applies."). Under the FSIA, a federal court lacks subject matter jurisdiction over enforcement proceedings unless it determines that a statutory exception to immunity from execution applies to allow execution. *See FG Hemisphere Assocs., LLC v. République du Congo* , 455 F.3d 575 (5th Cir. 2006).

a.   <u>TRIA does not override the Bank's Immunity</u>

Plaintiffs rest their entire argument on the fact that TRIA postdates § 1611, and therefore TRIA overrides all immunity conferred in that section. *See* Response at 8–10. But statutory interpretation does not rest upon only one canon of interpretation. Here, the Court is presented with two separate "notwithstanding" provisions—one in TRIA (codified in § 1610) and one in the section granting the Bank immunity (codified in § 1611). The key difference

2

being that TRIA's "notwithstanding" provision is general in nature ("Notwithstanding any other provision of law"), while § 1611's provision is specific in nature and explicitly *overrides* § 1610, which *includes* TRIA ("Notwithstanding the provisions of § 1610").

It is a well-established canon of statutory interpretation that "the specific governs the general." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992). That is particularly so where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citation omitted); *see also HCSC–Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam) (the specific governs the general "particularly when the two are interrelated and closely positioned, both in fact being parts of [the same statutory scheme]"). In this instance, Congress, in conjunction with the Executive, have laid forth a "large[] federal scheme, which includes recognition of a number of international organizations [and] which is designed to further the United States' foreign relations and to promote the United States' participation in international cooperation and commerce." *Int'l Fin. Corp. v. GDK Sys., Inc.*, 711 F. Supp. 15, 17 (D.D.C. 1989). That federal scheme should not be tampered with absent clear congressional intent. *See, e.g., United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) (noting that "'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" (quoting *Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804))).

A key part of that federal scheme is that international organizations, such as the World Bank, are protected from interference by any of its constituent members or that member's

courts.[1] Section 1611(a) furthers this federal scheme—indeed, the entire purpose of the immunity conferred in § 1611 is to preclude parties (like Plaintiffs) from impeding international organizations from disbursing funds as a "result of an action brought in the courts of the United States."[2] *See* 28 U.S.C. § 1611(a); *see also Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1624 (2018) ("[w]hen confronted with two Acts of Congress allegedly touching on the same topic, this Court . . . must . . . strive 'to give effect to both.'" (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). Congress did not intend (and Plaintiffs have presented no evidence to suggest) that the purpose of TRIA is to prevent the World Bank, a public international organization, or any other public international organization, from disbursing its funds. *See Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 698–99 (D.C. Cir. 2014) ("Absent clearly expressed congressional intent to the contrary, it is our duty to harmonize [conflicting statutory] provisions and render each effective.").

  b. <u>TRIA does not apply</u>

   Plaintiffs have failed to prove, and *cannot* prove, a TRIA claim here, and the Bank and its assets are therefore immune from attachment. To assert a claim under TRIA, Plaintiffs must prove that the Bank is in possession of "blocked assets" that belong to the Taliban (or its agencies or instrumentalities). Because assets held by the Bank: (1) cannot be blocked assets in this case; and (2) even they were, under U.S. Law, the Taliban is not recognized government of Afghanistan, and therefore they do not own any of the assets of the Da Afghanistan Bank

---

[1] This includes the fact that the Bank's assets are immune under its Articles of Agreement, a valid congressional-executive agreement that has also been incorporated into law under the Bretton Woods Agreements Act, 22 U.S.C. 286h. *See* Articles of Agreement, art. VII, §§ 3 and 4.

[2] This is not to say that the funds at issue here will *necessarily* be disbursed to any foreign state in particular, but the fact that funds *could* be disbursed to a foreign state is enough to override TRIA from impeding that process.

("DAB"), the Bank is immune from suit and the Writ must be quashed.[3]

### c.   The Bank Cannot Have Blocked Assets In This Case

Plaintiffs fundamentally misunderstand the Bank's argument regarding "blocked assets." As the Bank noted in its Motion (at 10–11), under its Articles of Agreement, the Bank does not have legal authority to hold assets of its members, *or any instrumentality thereof*, including the central bank of Afghanistan, DAB. The Bank certainly does not have the authority to hold any assets of the Taliban itself, a terrorist organization. As established by its founding Articles, the Bank *cannot* have a "blocked asset" of DAB because it cannot have any assets of DAB at all (regardless of whether the assets of DAB belong to the Taliban or not— which in the eyes of US law they do not).

Plaintiffs present no argument to the contrary, but instead cite to a "Trust Fund" that the World Bank administers as 'proof' that the Bank holds the Taliban's or DAB's assets. Response at 11. The Bank presumes the Plaintiffs are referring to the Afghanistan Reconstruction Trust Fund ("ART Fund"), a fund that "was established in 2002 to provide a coordinated financing mechanism for the Government of Afghanistan's budget and priority national investment programs."[4] Plaintiffs' arguments seem to go as follows:  General License No. 14 "unblocked" certain bank assets to be given to the Taliban (including, supposedly, the "Trust Fund"), and this License "could only serve to allow the release of the assets to the Taliban if, in fact, they were the blocked assets of the Taliban or otherwise owed to the Taliban

---

[3]Plaintiffs argue that the Bank made a "glaring omission" by excluding the phrase "including the blocked assets of any agency or instrumentality of that terrorist party." Response at 14–15. Plaintiffs appear to assert that the Bank was arguing that it does not hold assets of the Taliban, but allegedly neglected to tell the Court that it in fact holds assets of DAB, an "instrumentality" of the Taliban. Plaintiffs have completely misunderstood the Bank's Motion and in any event are wrong. First, the Bank argued in its Motion that it does not hold any assets of DAB (and cannot do so under its Articles). Motion at 10. Second, the Bank argued that even if it did hold the assets of DAB, those assets do not belong to the Taliban. Motion at 11.

[4]Afghanistan Reconstruction Trust Fund, https://www.artf.af/ (last visited Dec. 6, 2021).

in the first place." *Id.*

Plaintiffs' argument fails for several reasons. First, Plaintiffs fundamentally misunderstand the nature of the ART Fund. The ART Fund is a fund comprised of member *donor* money administered by the Bank to support Afghanistan.[5] So, even under Plaintiffs' strained theory of the case, this money is not an asset "of" the Taliban, DAB, or any other alleged instrumentality of the Taliban—it is a fund of assets, donated by member countries, which is administered by the Bank. Furthermore, General License No. 14 (upon which the Plaintiffs heavily rely) allowed the Bank to continue its humanitarian mission in Afghanistan, by "authorizing" the Bank to potentially engage in transactions with the Taliban "that are ordinarily incident and necessary to the provision of humanitarian assistance to Afghanistan or other activities that support basic human needs in Afghanistan."[6] It did not in any way, as Plaintiffs suggest, "unblock" the assets "of" the Taliban to be released to them. Any decision by the ART Fund or by the Bank to provide humanitarian assistance to the people of Afghanistan would be a discretionary act under the governance procedures of the ART Fund and the Bank to commit and disburse such funds.

Finally, Plaintiffs argue that even if the Bank did not hold any assets of DAB, Plaintiffs could somehow still "garnish[]" the payment of those funds from the Bank. Response at 17. This is simply not so. TRIA only allows for attachment over assets that are actually owned by

---

[5]Press Release, The World Bank, *Afghanistan Reconstruction Trust Fund Steering Committee Endorses New Four-Year Partnership and Financing Program* (June 9, 2021), https://www.worldbank.org/en/news/press-release/2021/06/09/afghanistan-reconstruction-trust-fund-steering-committee-endorses-new-four-year-partnership-and-financing-program.

[6]*See* Off. of Foreign Assets Control, U.S. Dep't of Treasury, General License No. 14, *Authorizing Humanitarian Activities in Afghanistan* (Sept. 24, 2021), https://home.treasury.gov/system/files/126/ct_gl14.pdf. The Bank disagrees with Plaintiffs assertion that "A license issued after the issuance of a writ is has no effect on a TRIA collection." Response at 12–14. However, the Court need not decide this issue to resolve the case. Should the Court require further briefing on this point, the Bank would be happy to supplement its Motion.

the terrorist organization, not assets that a terrorist organization allegedly may have an interest in at some future point in time. *See Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 938 (D.C. Cir. 2013). And a party cannot have an enforceable interest in a discretionary fund, like the ART Fund. In particular, courts in this circuit have "construed 'strictly against the garnisher' a statute 'in derogation of the common law,' because it risked penalizing 'a garnishee who owed the principal defendant nothing.'" *Id.* at 939 (Citing *Austin v. Smith*, 312 F.2d 337, 340–43 (D.C.Cir.1962)). This is "particularly acute with blocked assets." *Id.* To attach assets under TRIA, a plaintiff must demonstrate that the assets are "of" the terrorist party and are "blocked" under a TWEA or IEEPA sanctions program.. Plaintiffs have failed to do so.

But Plaintiff's argument that the Taliban may have an interest in certain Bank assets fails for a more fundamental reason—as noted in its Motion, the Bank is barred, *under its very Articles*, from lending money to organizations *other than* its members, sovereign states, and, when guaranteed by a sovereign member, to "any political sub-division thereof and any business, industrial, and agricultural enterprise in the territories of a member." *See* Articles of Agreement, art. III, § 4. The Taliban does not fall into any of these categories. So the Taliban has no interest in the funds of the ART Fund—or any funds of the Bank for that matter— because the Bank is barred from lending those funds to the Taliban.

d.  The Assets of DAB Are Not Assets of the Taliban

Plaintiffs next assert that it does not matter whether the United States recognizes the Taliban as the official government of Afghanistan because, according to Plaintiffs, "[c]learly, the Taliban controls assets, either directly or through Da Afghanistan Bank, which it controls." Response at 17. Plaintiffs make no effort to explain how, if the Taliban is not the recognized

government of Afghanistan (recognition only the President can give,[7] and has unquestionably not done), the assets of an instrumentality of the *government of Afghanistan* could in any way be an asset of a *terrorist organization*. Under U.S. law, the Taliban is not the recognized government of Afghanistan, and therefore, any instrumentalities of the Government of Afghanistan (such as the DAB), do not belong to the Taliban. Plaintiffs base their reliance on actions taken by the Taliban in Afghanistan to assert "control" over DAB's assets. However, these actions have neither established control under U.S. law or ownership, which is required for there to be blocked assets under IEEPA and E.O. 13224.

In any event, Plaintiffs well know that the question of whether the assets of DAB are subject to a writ of attachment at all is being posed to courts around the country. *See, e.g.*, *John Does 1 through 7 v. The Taliban*, No. 20 Misc. 740 (S.D.N.Y.) (Plaintiffs represented by do Campo & Thornton, P.A.); *Havlish v. Bin-Laden*, No. 03 Civ. 9848 (S.D.N.Y.); *Faulkner v. Bin Laden et al.*, No. 09 Civ. 7055 (S.D.N.Y.). Indeed, Plaintiffs—represented by the same law firm—have filed *another* attachment action based on the *same* default judgment in Texas in the Southern District of New York, pursuing a writ for the assets of DAB from the Federal Reserve Bank of New York, along with several other entities. *John Does 1 through 7 v. The Taliban*, No. 20 Misc. 740 (S.D.N.Y.). In that case, the United States has filed a notice of an intent to intervene, because of the "the complex issues relating to the status and attachability of the DAB assets subject to the writs." *Id.* ECF Nos. 29, 42.

The Bank believes the instant Writ must be quashed because:  (1) TRIA does not

---

[7] "The conduct of the foreign relations of our government is committed by the Constitution to the executive and legislative—'the political'—departments of the government . . . " *Oetjen v. Cent. Leather Co*., 246 U.S. 297, 302 (1918). Moreover, "the power to recognize foreign states resides in the President alone . . . ." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 28 (2015). Indeed, "recognition of foreign governments so strongly defies judicial treatment that without executive recognition a foreign state has been called 'a republic of whose existence we know nothing . . . .'" *Baker v. Carr*, 369 U.S. 186, 212 (quoting *United States v. Klintock*, 18 U.S. 144, 149 (1820)).

abrogate the Bank's immunity; and (2) the Bank does not have "blocked assets" in the case, and thus, this Court need not reach the question of the applicability of the writ to the assets of DAB; however, to the extent the Court believes that the ownership of DAB's assets is dispositive in this case, given the complexity of the issue, the sensitive nature surrounding recognition of foreign governments, and the need for uniform judgments, the Bank requests the Court stay any decision on the Motion until the United States has filed its statement of interest in the related S.D.N.Y. case.[8]

Finally, the Bank takes serious issue with Plaintiffs framing of this suit. Plaintiffs paint the false choice that the Court must decide whether certain money is going into the hands of the Taliban or "victims of the Taliban." Nothing could be further from the truth—the money in the Bank's ART Fund[9] has been committed by donor governments to the *people* of Afghanistan who are suffering one of the "worst humanitarian disaster[s] [] ever seen."[10] Indeed, General License No. 14 was specifically put into place so that the Bank could continue its humanitarian mission in Afghanistan—helping to potentially save millions of lives from destitute poverty and hardship. Plaintiffs' Writ could impede the Bank's authorized and international mission of assisting the people of Afghanistan. The purpose of TRIA is to punish terrorist entities and deter future terrorism. As Senator Harkin, the lead sponsor of the TRIA, observed, "making the state sponsors [of terrorism] actually lose" money will be a particularly effective deterrent against future terrorist acts. 148 Cong. Rec. S11,527 (daily ed. Nov. 19,

---

[8] The U.S. Government's Statement of Interest is currently due January 28, 2020. *John Does 1 through 7 v. The Taliban*, No. 20 Misc. 740, ECF No. 44 (S.D.N.Y.).

[9] The Bank's argument is, of course, not limited to the ART Fund—the Bank's lending activities aim to reduce poverty by providing low-interest loans and grants to sovereign governments for investment in education, health, public administration, energy, infrastructure, financial and private sector development, agriculture, and environmental and natural resource management.

[10] Saheli R. Choudhury, *Afghanistan is facing the 'worst humanitarian disaster we've ever seen,' the UN says*, CNBC (Nov. 12, 2021, 1:15 AM), https://www.cnbc.com/2021/11/12/afghanistan-is-facing-a-humanitarian-disaster-un-says.html.

2002) (statement of Sen. Harkin). Yet, paying judgments from assets that are not owned by the terrorist party does not impose a similar cost on the terrorist party. It can, however, impose a heavy cost on non-terrorist property owners.

## II.    Plaintiffs Have Failed To Properly Serve The Bank[11]

Even assuming Plaintiffs are correct that service is not required by United States Marshal (and the Bank is not conceding they are), Plaintiffs have nevertheless *still* failed to properly serve the Bank under standard rules governing service of process. The D.C. Court of Appeals has held that "a writ of attachment after judgment may be properly served on a corporate garnishee by delivering it to 'an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process ....'" *Wrecking Corp. of Am., Virginia, Inc. v. Jersey Welding Supply, Inc.*, 463 A.2d 678, 679 (D.C. 1983) (citing Super. Ct. Civ. R. 4). Service was not "proper" here because it was served on a security guard, who specifically told the process server that he was not "authorized" to receive service. *See* ECF No. 5, Affidavit of Service of Writ on IBRD ("Security stated they are not authorized to accept service. I . . . served security guard M. Battle by leaving the documents at his feet.") Service at the "feet" of a security guard not authorized to accept service of process does not—and cannot—constitute effective service on the Bank under any standard. *McLaughlin v. Fidelity Sec. Life Ins*., 667 A.2d 105, 106 (D.C. 1995) ("The rule is clear that it must appear that any agent who accepts service must be shown to have been authorized to bind his principal by the acceptance of process . . . ."); *Jones v. Auto. Club of S. California*, 26 F. App'x 740, 743 (9th Cir. 2002) (service on security guard does not constitute proper service under federal rules); *see also Bulin v. Stein*, 668 A.2d 810, 814 (D.C. 1995) ("[T]he

---

[11]As noted in the Bank's Motion, the Bank is immune from all forms of judicial process, *including* service of process. *See* Motion at 6. For the sake of clarity, the Bank notes that to the extent the Court is inclined to find the Bank *not* immune, the Bank presented this secondary argument that the writ must be quashed because the Bank was not properly served.

fact that [defendant] received actual notice of the action is immaterial to the sufficiency of service of process.").  Because the Bank has not been properly served, the Court does not have personal jurisdiction over the Bank, and the Writ must quashed.


Dated: December 6, 2021                     Respectfully Submitted,


                                            By:  /s/ Jeffrey T. Green

                                            Jeffrey T. Green (D.C. Bar #426747)
                                            SIDLEY AUSTIN LLP
                                            1501 K Street, N.W.
                                            Washington, D.C. 20005
                                            (202) 736-8000
                                            jgreen@sidley.com

                                            *Counsel for International Bank for
                                            Reconstruction and Development*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 6th Day of December, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

> John Andres Thornton
> DO CAMPO & THORNTON, PA
> 150 S.E. 2nd Avenue
> Suite 602
> Miami, FL 33131
> (305) 358-6600
> Fax: (305) 358-6601
> Email: jt@dandtlaw.com
> *Attorney for Plaintiffs John Does 1-7*

Respectfully submitted,

By: /s/ Jeffrey T. Green

Jeffrey T. Green (DC Bar #426747)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000
jgreen@sidley.com

*Counsel for International Bank for*
*Reconstruction and Development*