IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOHN DOES 1 THROUGH 7,

                Plaintiffs,

     v.

THE TALIBAN, AL-QAEDA, and
THE HAQQANI NETWORK,

                Defendants.

Misc. Action No. 1:21-mc-00110-DLF

**REPLY IN SUPPORT OF**
**THE INTERNATIONAL MONETARY FUND'S MOTION TO QUASH**

December 6, 2021

James R. Newland, Jr. (DC Bar No. 477804)
Bret C. Marfut (DC Bar No. 888144675)
SEYFARTH SHAW LLP
975 F Street, N.W.
Washington, DC 20004
Telephone: (202) 463-2400
Facsimile:  (202) 828-5393
jnewland@seyfarth.com
bmarfut@seyfarth.com

*Attorneys for the International Monetary*
*Fund, Appearing Specially*

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ...................................................................................................1

II.     ARGUMENT ........................................................................................................2

      A.     Plaintiffs ignore Jam and Nyambal, which dictate that the Fund has absolute immunity in this garnishment proceeding. .............................................. 2

      B.     Whether the Fund's Articles are an Article II treaty is irrelevant........................... 5

      C.     TRIA does not touch the Fund's immunity. ......................................................... 7

            i.     TRIA targets the execution immunity of sovereign assets. .........................7

            ii.    The Fund's immunity under the BWAA and its Articles does not conflict with TRIA.................................................................................11

      D.     Plaintiffs' cursory argument about the validity of service fails. ........................... 18

III.    CONCLUSION....................................................................................................19

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*,
  988 F.2d 295 (2d Cir. 1993)...................................................................................18

*Bennett v. Islamic Republic of Iran*,
  604  F. Supp. 2d 152 (2009) ....................................................................................8

*Cook v. United States*,
  288 U.S. 102 (1933)................................................................................................13

*de Csepel v. Republic of Hungary*,
  714 F.3d 591 (D.C. Cir. 2013)................................................................................18

*EM Ltd. v. Republic of Argentina*,
  473 F.3d 463 (2d Cir. 2007)..................................................................................3, 6

*Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*,
  280 F. Supp. 2d 314 (S.D.N.Y.2003), *aff'd*, 346 F.3d 264 (2d Cir. 2003) .........................9, 10

*Garcia v. Sebelius*,
  919 F. Supp. 2d 43 (D.D.C. 2013) .........................................................................18

*Heiser v. Islamic Republic of Iran*,
  735 F.3d 934 (D.C. Cir. 2013)................................................................................15

*Jam v. Int'l Fin. Corp.*,
  139 S. Ct. 759 (2019)......................................................................1, 2, 4, 5, 7, 16

*Kissi v. de Laroisiere*,
  No. 82-1267 (D.D.C. June 23, 1982) (J.H. Green, J.) ............................................2

*Leonard A. Sacks & Associates, P.C. v. Intl. Monetary Fund*,
  CV 20-2266, 2021 WL 1166738 (D.D.C. Mar. 26, 2021), appeal filed, No. 21-7034 (D.C. Cir. Mar. 6, 2021)...................................................................................2

*Letelier v. Republic of Chile*,
  748 F.2d 790 (2d Cir. 1984)....................................................................................9

*Menominee Tribe of Indians v. United States*,
  391 U.S. 404 (1968)................................................................................................13

*Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran*
   *v. Elahi*,
   556 U.S. 366 (2009) .................................................................................................15

*Moore v. United Kingdom*,
   384 F.3d 1079 (9th Cir. 2004) .............................................................................18

*Morton v. Mancari*,
   417 U.S. 535 (1974) .............................................................................................17

*Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*,
   526 U.S. 344 (1999) .............................................................................................18

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
   551 U.S. 644 (2007) .............................................................................................17

*Nyambal v. Int'l Monetary Fund*,
   772 F.3d 277 (D.C. Cir. 2014) ...............................................1, 2, 4, 5, 7, 16, 18

*Owner-Operator Indep. Drivers Ass'n, Inc. (OOIDA) v. U.S. Dep't of Transp.*,
   724 F.3d 230 (D.C. Cir. 2013) .................................................1, 12, 13, 14, 15, 16

*Polak v. Int'l Monetary Fund*,
   657 F. Supp. 2d 116 (D.D.C. 2009) .......................................................................2

*Roeder v. Islamic Republic of Iran ("Roeder I")*,
   333 F.3d 228 (D.C. Cir. 2003) .......................................................................13, 16

*Roeder v. Islamic Republic of Iran ("Roeder II")*,
   646 F.3d 56 (D.C. Cir. 2011) .........................................................................13, 16

*Rubin v. Islamic Republic of Iran*,
   138 S. Ct. 816 (2018) ..........................................................................................8, 9

*S. Dakota v. Bourland*,
   508 U.S. 679 (1993) .............................................................................................12

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993) ............................................................................................7, 8

*Stoll v. Liuksila*,
   No. PS 3346-097F (D.C. Super. Ct. Sept. 30, 2003) .............................................3

*Ungaro-Benages v. Dresdner Bank AG*,
   379 F.3d 1227 (11th Cir. 2004) .............................................................................6

*United States v. Ballestas*,
   795 F.3d 138 (D.C. Cir. 2015) .............................................................................17

*United States v. Holy Land Found. For Relief & Dev.*,
    445 F.3d 771 (5th Cir. 2006) ........................................................................11

*Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*,
    443 U.S. 658 (1979) ....................................................................................13

*Weinberger v. Ross*i,
    456 U.S. 25 (1982) ................................................................................6, 13

*Weininger v. Castro*,
    462 F. Supp. 2d 457 (S.D.N.Y. 2006) ..............................................8, 9, 10, 11

*Wyatt v. Syrian Arab Republic*,
    83 F. Supp. 3d 192 (D.D.C. 2015) ...............................................................18

**Statutes**

21 U.S.C. § 853(e) ............................................................................................11

22 U.S.C. § 286h ......................................................................................1, 4, 17

22 U.S.C. § 288a(b) ............................................................................................5

28 U.S.C. § 1604 ................................................................................................8

28 U.S.C. § 1605 ................................................................................................8

28 U.S.C. § 1609 ................................................................................................8

28 U.S.C. § 1610 ............................................................................................8, 9

28 U.S.C. § 1610(f) ...........................................................................................15

28 U.S.C. § 1610(f)(1) ..................................................................................14, 15

28 U.S.C. § 1610(f)(3) ..................................................................................15, 16

28 U.S.C. § 1610, note, sub-part (d)(4) ......................................................8, 16, 17

Foreign Sovereign Immunities Act ....................................................................1, 2

International Organizations Immunities Act .................................................2, 5, 10

60 Stat. 1401, T.I.A.S. 1501 (Dec. 27, 1945) ........................................................3

Terrorism Risk Protection Act, 107th Congress (2001-2002) ................................14

**Other Authorities**

148 Cong. Rec. 23,121 (Nov. 19, 2002) ...........................................................................15

H.R. Conf. Rep. No. 107–779, at 27, U.S.Code Cong. & Admin.News 2002, pp.
    1430, 1434.................................................................................................................15

H.R. REP. 94-1487, 30-31, 1976 U.S.C.C.A.N. 6604 (1976) ........................................11

House Report 107-300 ....................................................................................................14

House Report 107-779 ....................................................................................................14

Vienna Convention on the Law of Treaties art. 2.1(a), *opened for signature* May
    23, 1969, 1155 U.N.T.S. 331 ......................................................................................6

## I.  INTRODUCTION

Not once in their opposition do Plaintiffs mention *Jam* or *Nyambal*, the authoritative pronouncements of the U.S. Supreme Court and D.C. Circuit on the International Monetary Fund's ("IMF" or "Fund") absolute immunity from judicial process under the Articles of Agreement and the Act giving it effect. Those authorities demonstrate not only the Fund's absolute immunity absent its own express waiver but also that the Fund's immunity is borne of international necessity. The Fund needs absolute immunity to carry out its obligations in its 190 member countries without unilateral intervention by any one of them. That is why the United States (and each of the 190 member countries) fulfilled its obligations as a member country by enshrining the immunity provisions of the Articles of Agreement (itself an international agreement) into domestic law (22 U.S.C. § 286h).

Plaintiffs urge this Court to do something no other court has ever done. And in so doing, they ask this Court to set aside the established rules of statutory interpretation and upend the international order that has been in place since World War II. They seek a ruling abrogating the Fund's immunity even in the absence of express waiver based *not* on the controlling law (which they ignore), but on their theory that Congress intended to abrogate the Fund's longstanding immunity through a provision (TRIA) cabined within a separate statutory scheme (FSIA) without *even once* mentioning that it was doing so anywhere in TRIA's text or legislative history. Among other things, their theory contradicts this circuit's rule that abrogation of international agreements requires a "clear and overt indication from Congress." *Owner-Operator Indep. Drivers Ass'n, Inc. (OOIDA) v. U.S. Dep't of Transp.*, 724 F.3d 230, 234 (D.C. Cir. 2013).

But this is a fundamental hurdle that Plaintiffs never cross: TRIA does not, cannot, and was never intended to create an independent right of jurisdiction over the Fund. TRIA takes away certain immunities granted under the Foreign Sovereign Immunities Act. The Fund,

however, enjoys absolute immunity from every form of judicial process granted in a multilateral international agreement and its implementing legislation—not the lesser immunity of foreign states and international organizations enjoying default levels of immunity provided through the FSIA or the International Organizations Immunities Act ("IOIA"). Plaintiffs' theory does not survive *Jam* and *Nyambal*, which confirm the Fund's absolute immunity even after TRIA's enactment.

## II.    ARGUMENT

### A.    Plaintiffs ignore *Jam* and *Nyambal*, which dictate that the Fund has absolute immunity in this garnishment proceeding.

*Jam* and *Nyambal* are the controlling decisions authoritatively interpreting the scope of the Fund's immunity. Those cases, as the Fund explained (DE 14-1, pp. 5-7), set forth this clear test: the Fund "enjoys 'immunity from *every form* of judicial process except to the extent that it expressly waives its immunity.'" *Jam v. Int'l Fin. Corp.*, 139 S. Ct. 759, 771–72 (2019) (emphasis added); *Nyambal v. Int'l Monetary Fund*, 772 F.3d 277, 281 (D.C. Cir. 2014) ("the Fund is immune absent express waiver under its Articles of Agreement."); *accord* Articles of Agreement, Art. IX, Section 3 ("The Fund … shall enjoy immunity from every form of judicial process except to the extent that it expressly waives its immunity"). The Fund indisputably has not waived its immunity here. That ends the analysis.

Although the plaintiffs fail to address *Jam* and *Nyambal*, the Court *cannot* disregard those cases (or the many others finding the Fund absolutely immune from suit[1])—nor should it because the Fund's absolute immunity plays an essential role on the global financial stage.

---

[1] *Leonard A. Sacks & Associates, P.C. v. Intl. Monetary Fund*, CV 20-2266 (TJK), 2021 WL 1166738, at *2–3 (D.D.C. Mar. 26, 2021), appeal filed, No. 21-7034 (D.C. Cir. Mar. 6, 2021); *Polak v. Int'l Monetary Fund*, 657 F. Supp. 2d 116, 120 (D.D.C. 2009); *Kissi v. de Laroisiere*,

"The IMF is a unique cooperative international institution established by treaty—the Bretton Woods Agreement—following the end of the Second World War. *See* Articles of Agreement of the IMF, 60 Stat. 1401, T.I.A.S. 1501 (Dec. 27, 1945)." *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 482 (2d Cir. 2007). The Fund's "primary mission is to ensure the stability of the international monetary system—the system of exchange rates and international payments that enables countries and their citizens to transact with each other."[2] The Fund lends only to sovereigns and generally ties such lending to fiscal reforms. *EM Ltd.*, 473 F.3d at 482-84 & n.21 (The Fund plays a "unique role" in "regulating the international monetary system by intervening in the economies of its members.").

As explained (DE 14-1, pp. 6-7), for the Fund to fulfill its purposes—including promoting international monetary cooperation and exchange stability among its 190 member countries (Articles of Agreement, Art. I)—it needs absolute immunity from judicial process to avoid unilateral interference by the courts of any one of those 190 member countries. *See* Art. IX, Section 1 (immunities necessary "[t]o enable the Fund to fulfill the functions with which it is entrusted").[3] Permitting the Fund's member countries to exercise unilateral control over the Fund—including seizing SDRs the Fund can only allocate to its member countries—would severely impede the Fund's ability to fulfill its role under the Articles of Agreement.

_____

No. 82-1267, at 2 (D.D.C. June 23, 1982) (J.H. Green, J.); *Stoll v. Liuksila*, No. PS 3346-097F (D.C. Super. Ct. Sept. 30, 2003).

[2] International Monetary Fund, *The IMF at a Glance*, available at https://www.imf.org/en/About/Factsheets/IMF-at-a-Glance (March 3, 2021) (last visited Dec. 2, 2021); *see also* Articles of Agreement art. I (explaining the Fund's purposes).

[3] "The Fund, its property and its assets" are absolutely immune not only from judicial process absent its own express waiver, but also from every form of "seizure by executive or legislative action." Articles of Agreement, Art. IX, Sections 3, 4.

The need for absolute immunity was so foundational to the Fund's charter that the Articles specifically obligated "[e]ach member [to] . . . mak[e] effective in terms of its own law the principles set forth in [Article IX] and [to] inform the Fund of the detailed action which it has taken." Art. IX, Section 10. The United States, an original member country, obliged by giving Article IX, Sections 2 to 9, statutory force in the Bretton Woods Agreements Act (BWAA), 22 U.S.C. § 286h. The BWAA thus reflects the United States' longstanding commitment to the Fund as a member country to "provid[e] it with immunity (absent waiver) *in all cases*." *Jam*, 139 S. Ct. at 777 (Breyer, J. dissenting) (emphasis added).[4]

Plaintiffs (besides ignoring *Jam* and *Nyambal*) casually dismiss the essential role the Fund's absolute immunity plays in the international order. They contend "the heavens will not fall" if the Fund has to "relinquish money" to them, citing the "countervailing good of sanctioning terrorism and compensating victims . . . ." DE 20, p. 13. Setting aside the fact that there is no "money" to release[5], it is not up to Plaintiffs (or this Court) to decide how best to balance the unimpeded work of the Fund against another asserted "countervailing good." That balancing was struck by the United States and the other 190 member countries when they signed on to the Articles, and by the U.S. Congress when it enacted the BWAA—and the balance was struck in favor of absolute immunity. *Jam,* 139 S. Ct. at 771.

Indeed, the U.S. Supreme Court recognized that international organizations are empowered to protect their functioning through broad immunity provisions: "[i]f the work of a

---

[4] Any member country that "fails to fulfill any of its obligations under [the Articles of] Agreement" is subject to progressive sanction, up to and including compulsory withdrawal from membership in the Fund. *See* Art. XXVI, Section 2.

[5] As noted in DE 14-1, pp 4, fn. 3. To be clear, in their Writ of Garnishment and their submissions to the Court, Plaintiffs fail to identify any "blocked asset" held by the Fund.

given international organization would be impaired by restrictive immunity, the organization's

charter can always specify a different level of immunity." *Id*. The Fund's charter, the Supreme

Court specifically noted, "*do[es] just that*." *Id.* (emphasis added); *accord Nyambal*, 772 F.3d at

281 ("The sweep of the Fund's immunity is broader than the protection afforded" to other

international organizations by IOIA, 22 U.S.C. § 288a(b)). Nothing in the Articles, the BWAA,

*Jam*, or *Nyambal* creates a "heavens will not fall" exception to immunity—nor any exception

other than the Fund's own express waiver.

Equally unpersuasive is Plaintiffs' suggestion that the intrusion on the Fund is justified

because the Fund's own assets are not up for attachment. DE 20, p. 13. As *Nyambal* explains

(and Plaintiffs again ignore), the Fund's "immunity, where justly invoked, shields [the Fund] not

only from the consequences of litigation's results but *also from the burden of defending*'" an

action. 772 F.3d at 280-81 (emphasis added).

In sum, Plaintiffs brush aside the plain terms of the Articles and the BWAA, as well as

the controlling case authority. They instead ask this Court to create an unprecedented exception

to the Fund's immunity—thereby threatening the very foundation of the Fund's

intergovernmental work and jeopardizing the United States' compliance with its obligations as a

member country—based on two meritless arguments. The Fund addresses those next.

> **B.**     **Whether the Fund's Articles are an Article II treaty is irrelevant.**

Plaintiffs contend that, because the Fund's Articles are not a "treaty" as defined in Article

II, Clause 2 of the Constitution, the Fund cannot assert that "its Articles carry the force of law

superior to a U.S. Statute." DE 20, pp. 9-10. This is a strawman built on a strawman: the Articles

*are* a "treaty" as that term is used in U.S. law, and in any event, the Fund's immunity argument

does not depend on any hierarchical superiority over U.S. statutory law.

Under both U.S. law and international law, "the word ['treaty'] ordinarily refers to an international agreement concluded between sovereigns, regardless of the manner in which the agreement is brought into force." *Weinberger*, 456 U.S. at 29, 30 ("treaty" in anti-discrimination statute covered an international agreement never submitted to the Senate for advice and consent); *accord Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1234 (11th Cir. 2004). The State Department uses this broader definition in its yearly listing of treaties in force—a publication that includes the Articles.[6] The Fund's Articles—a multilateral agreement between 190 member states—are, according to domestic and international law, a treaty given effect by statute. *EM Ltd.*, 473 F.3d at 482 (calling the Bretton Woods Agreement "a treaty").

Ultimately, these semantics are irrelevant. The Fund's immunity depends not on any hierarchical superiority over U.S. law, but on the fact that, *as a matter of statutory interpretation*, TRIA does not abrogate the Articles of Agreement or the BWAA. However, because the Fund's Articles are governed by the law of nations, its status as an international agreement is critical to the statutory analysis. As explained in Part (C), courts must, where possible, harmonize domestic statutes with the law of nations. This interpretive rule applies to international agreements—*not* just Article II treaties. *Weinberger*, 456 U.S. at 29. Thus, the Articles' status as an international agreement is important to the Court's analysis of TRIA and the BWAA, but its lack of Article II treaty status is irrelevant.

---

[6] *See* United States Department of State, A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020 (available at www.state.gov/wp-content/uploads/2020/08/TIF-2020-Full-website-view.pdf) at 527 (listing the Fund's Articles in Section 2, "Multilateral Treaties and Other Agreements"). *See also* Vienna Convention on the Law of Treaties art. 2.1(a), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331 ("'treaty' means an international agreement concluded between States in written form and governed by international law").

## C. TRIA does not touch the Fund's immunity.

In order to advance their position, Plaintiffs ignore the applicable international agreement (the Articles), its implementing statute (the BWAA), and the controlling case law (*Jam*, *Nyambal*). Instead, Plaintiffs invoke a provision that is irrelevant to the Fund's immunity (TRIA) and codified in a separate statutory scheme (FSIA) that does not create any right of jurisdiction over the Fund. TRIA did not (and cannot), *sub silentio*, create that right of jurisdiction or pierce the Fund's immunity and thereby upend decades of international order.

As the Fund previously explained, TRIA is a statutory exception to the immunity otherwise enjoyed by *foreign states* and their property under the FSIA. DE 14-1, pp. 8-10. The Fund's *independent* immunity from judicial process, enshrined in its Articles and the BWAA, is untouched by the FISA and TRIA. In other words, even if TRIA were to override the immunity of a sovereign (Afghanistan) and the immunity of particular assets of the sovereign and its agents, Plaintiffs have not cleared the first immunity hurdle posed by the Articles and the BWAA. DE 14-1, pp. 9-11. As *Jam* and *Nyambal* make clear, the Fund enjoys the highest level of immunity from every form of judicial process—immunity that is far beyond the default rule of restrictive immunity; and that hurdle can be cleared *only* by the Fund's own express waiver of its absolute immunity.

Plaintiffs nevertheless insist that TRIA sweeps far beyond the confines of the FSIA and "overrides all prior immunities." DE 20, p. 10. The argument fails for multiple reasons.

### i. TRIA targets the execution immunity of sovereign assets.

The FSIA "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Under the FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against

a foreign state." *Id.* The FSIA grants two types of immunity: (a) it grants foreign states

"immunity from suit in the United States (called jurisdictional immunity)," and (b) it "grants

their property immunity from attachment and execution in satisfaction of judgments against

them. See 28 U.S.C. §§ 1604, 1609." *Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 822

(2018).

The FSIA also takes those immunities away in specified circumstances. *See e.g.* 28

U.S.C. § 1605 ("General Exceptions to the Jurisdictional Immunity of a Foreign State"); 28

U.S.C. § 1610 ("Exceptions to the Immunity from Attachment or Execution"). TRIA is one such

FSIA immunity exception. TRIA appears in Title 28, Chapter 97—titled "Jurisdictional

Immunities *of Foreign States*" (emphasis added)—and is codified as a note to 28 U.S.C. § 1610,

the provision creating exceptions to foreign states' attachment immunity. TRIA, by its placement

in section 1610, defines the scope of a foreign state's sovereign and attachment immunity—and,

by extension, the scope of a court's subject matter jurisdiction. *See Bennett v. Islamic Republic of

Iran*, 604  F. Supp. 2d 152, 159 (2009) (describing TRIA as a "key amendment" to the FSIA that

"furnishes a number of exceptions to the general rule that the property of a foreign sovereign is

immune from attachment or execution").

So understood, TRIA is a jurisdictional statute that takes away the sovereign and

attachment immunities that *the FSIA otherwise grants* with respect to "blocked assets" of a

"terrorist party" (which is defined to include "a foreign state designated as a state sponsor of

terrorism…," 28 U.S.C. § 1610, note, sub-part (d)(4)).[7] Thus, *Weininger v. Castro*, 462 F. Supp.

---

[7] That TRIA permits judgment creditors to attach assets of any *non-state* "terrorist" or "terrorist
organization" says nothing about the breadth of TRIA's immunity waiver, as Plaintiffs suggest.
DE 21 (Opposition to IBRD Motion to Quash), p. 10. By definition, a non-state terrorist actor

2d 457 (S.D.N.Y. 2006) is not the silver bullet Plaintiffs make it out to be. DE 20, p. 10. In

*Weininger*, the garnishee banks were "agencies and instrumentalities of Cuba as defined in §

1603(b)," meaning the source of their immunity *was the FSIA itself. Id.* at 482. The district court,

determining whether to exercise jurisdiction over the garnishees and their property, held that "it

makes sense to interpret § 201(a) of TRIA to . . . provide . . . an exception to immunity" because

"TRIA is codified as a note to § 1610, which is one of the statutory sections providing exceptions

to immunity" under the FSIA. *Id.* at 484.

Weininger also held that TRIA overrode another immunity provision *found in the FSIA*,

section 1611(b)—which confers immunity on "the property of a foreign state" if "the property is

that of a foreign central bank"—"because TRIA § 201(a)'s provisions apply 'notwithstanding

any other provision of law.'" 462 F. Supp. 2d at 484 (quoting 28 U.S.C. § 1610 note).

*Weininger* tracks the cases the Fund previously cited (DE 14-1, pp. 8-9), which describe TRIA as

an exception to the immunity otherwise enjoyed by foreign states and their property *under the*

*FSIA*.[8]

The Fund is aware of no case—and Plaintiffs point to none—that holds TRIA's removal

of execution immunity over the property of state sponsors of terror abrogates *other* non-FSIA

---

cannot invoke any immunity. Thus, TRIA's immunity exception is irrelevant for these non-state
actors.

[8] *See, e.g.*, *Rubin*, 138 S. Ct. at 824 (TRIA allows "judgment holders to attach and execute
against *property of a foreign state*, '[n]otwithstanding any other provision of law,' including
those provisions otherwise granting immunity"); *Letelier v. Republic of Chile*, 748 F.2d 790, 793
(2d Cir. 1984) ("[U]nder § 1609 *foreign states* are immune from execution upon judgments
obtained against them, unless an exception set forth in §§ 1610 or 1611 of the FSIA applies.");
*Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of New York*, 280 F. Supp. 2d 314, 319
(S.D.N.Y.2003) ("[T]o the extent that a *foreign country's* sovereign immunity potentially
conflicts with Section 201(a), the 'notwithstanding' phrase removes the potential conflict."),
*aff'd*, 346 F.3d 264 (2d Cir. 2003)) (emphasis added).

immunities, including the absolute immunity enjoyed by the Fund under the BWAA and the Articles. That makes sense because TRIA "necessarily has a scope and that scope depends on the substance of the provision to which it is attached." *Smith*, 280 F. Supp. 2d at 319, aff'd, 346 F.3d 264, 271 (2d Cir. 2003). The statute to which TRIA is attached (the FSIA) governs jurisdiction over, and the immunities of, sovereigns and their property—it does not reach the BWAA.

Finally, the Fund never "concede[d]," as Plaintiffs contend (DE 20, p. 11 n.8), that TRIA overrides the immunities in § 1611. Given the legislative history of the FSIA and TRIA, the district court's holding in *Weininger* that TRIA trumps § 1611 sub-part(b), which applies to central banks of foreign states, is hardly settled law.[9] More to the point, *Weininger* did not expressly address whether TRIA overrides § 1611, sub-part (a), which provides attachment immunity for the "property of [international] organizations" that would be disbursed "to, or on the order of, a foreign state[,]" as that was not the issue presented. In *Weininger*, only § 1611(b) was at issue, not (a). Certainly, piercing the immunity for property belonging to a state sponsor of terror (and its central bank under § 1611(b)) is a far cry from attaching the assets at an international organization.

This Court need not resolve these issues, however, because the Fund's immunity is not the restrictive form of immunity granted to international organizations under the IOIA and therefore it is not grounded in execution immunity under section 1611. Rather the Fund enjoys an independent basis of immunity from judicial process under the BWAA and Articles. The FSIA's legislative history recognizes that, whatever the scope of immunity conferred under section 1611(a), "[t]he reference to 'international organizations' in this subsection *is not intended*

---

[9] *See also* discussion in Section 3(ii)(a), *infra* (*Weininger* applied the "last-in-time" rule which is not the appropriate analysis here).

*to restrict any immunity accorded to such international organizations under any other law or international agreement*." H.R. REP. 94-1487, 30-31, 1976 U.S.C.C.A.N. 6604, 6629-30 (1976) (emphasis added).

### ii.   *The Fund's immunity under the BWAA and its Articles does not conflict with TRIA.*

In arguing that TRIA overrides the jurisdictional immunity held by the Fund, Plaintiffs place near-exclusive reliance on TRIA's use of the terms "Notwithstanding any other provision of law" and "in every case." DE 20, pp. 10-11. But even in *Weininger*, which is one of the two cases on which Plaintiffs rely (DE 20, p. 10), TRIA's "notwithstanding" clause overrode only *FSIA* attachment immunity. *Weininger*, 462 F. Supp. 2d at 488 ("'notwithstanding' language ... appears to target statutory immunities *to execution*.") (emphasis added).

The other case Plaintiffs cite, *United States v. Holy Land Found. For Relief & Dev.*, 445 F.3d 771, 787 (5th Cir. 2006), was vacated on rehearing, and in a later decision in the same case, the Fifth Circuit held that TRIA did *not* override a criminal forfeiture statute (21 U.S.C. § 853(e)) that placed certain assets out of TRIA's reach. 722 F.3d 677, 681 (5th Cir. 2013). The Fifth Circuit faulted plaintiffs and the district court for "find[ing] conflict between two statutes where there is none and grant[ing] undue power to [TRIA's] 'notwithstanding' clause." 722 F.3d at 688 (criticizing plaintiffs' "sweeping assertion" that "the 'notwithstanding' clause trumps any other law that has the incidental effect of removing funds from the reach of judgment creditors.").

Even if TRIA overrides the FSIA *execution* immunity over a terrorist actor's blocked assets, it is an unsupported analytical leap to say that it *also* abrogates every independent *non-FSIA* immunity an alleged garnishee may hold—including immunities embodied in international agreements and codified in separate enabling legislation. This Court should not make that leap—

11

Plaintiffs offer no legislative history to support it, and creating such a conflict between TRIA and the BWAA/Articles would violate well-established canons of statutory interpretation:

     *a.*     The D.C. Circuit instructs that courts must "presume that newly enacted statutes do not automatically abrogate existing treaties," and that the "same principles govern" international agreements "even though they [are] not formal treaties ratified by the Senate." *OOIDA*, 724 F.3d at 234. In *OOIDA,* the statute at issue "sp[oke] in general yet textually unambiguous terms," requiring commercial motor vehicle operators to "have 'a current valid medical certificate.'" *Id.* (quoting 49 U.S.C. § 31149(c)(1)(B)). The statute included "[n]o exception … for those drivers living in Canada or Mexico who operate their vehicles within the United States," even though the United States had "executive agreements" (which are "not quite treaties") with those countries with different licensing requirements. *Id.* The question thus arose: "whether a *facially unambiguous statute of general application* is enough to abrogate an existing international agreement without some further indication Congress intended such a repudiation. We conclude it is not." *Id.* at 232 (emphasis added).

     The D.C. Circuit began its analysis by acknowledging the "last-in-time rule": if statutes and treaties clash, "the more recent legal pronouncement controls." *Id.* at 233. "But though the last-in-time rule tells courts how to resolve clashes between statutes and treaties, *courts prefer to avoid such conflicts altogether.*" *Id.* at 233-34 (emphasis added). Thus, the D.C. Circuit instead followed the "clear statement rule": "absent some clear and overt indication from Congress, we will not construe a statute to abrogate existing international agreements even when the statute's text is not itself ambiguous." *Id.* at 234; *S. Dakota v. Bourland*, 508 U.S. 679, 687 (1993)

("Congress has the power to abrogate Indians' treaty rights … though we usually insist that Congress clearly express its intent to do so.").[10]

"Like all clear statement rules," the D.C. Circuit continued, "the one we acknowledge today injects clarity into the policymaking process" and "permits Congress, the President, the courts, and the public alike to better comprehend the actual implications of legislation." 724 F.3d at 238. The court acknowledged that, "requiring a clear statement rule with respect to implicit abrogation of international agreements 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" *Id.* at 236 (quoting *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013)).

Applying these principles to the statute at issue, the court observed that "if Congress or the President understood the Act to be a repudiation of the federal government's obligations to Mexico and Canada, someone would have said something." 724 F.3d at 237. Yet "the Act's legislative history makes no mention of the executive agreements with Canada and Mexico, let

---

[10] The D.C. Circuit noted that "our precedents and the Supreme Court's routinely characterize the presumption against implicit abrogation of international agreements as a clear statement rule." 724 F.3d at 234–35 (citing *Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) ("Legislative silence is not sufficient to abrogate a treaty."), *Weinberger v. Ross*i, 456 U.S. 25, 32 (1982) ("some affirmative expression of congressional intent to abrogate the United States' international obligations is required...."), *Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 690 (1979) ("Absent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights."), *Cook v. United States*, 288 U.S. 102, 120 (1933) ("A treaty will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed."), *Roeder v. Islamic Republic of Iran ("Roeder I")*, 333 F.3d 228, 238 (D.C. Cir. 2003) ("Congress (or the President acting alone) may abrogate an executive agreement, but legislation must be clear to ensure that Congress—and the President—have considered the consequences."), *Roeder v. Islamic Republic of Iran ("Roeder II")*, 646 F.3d 56, 61 (D.C. Cir. 2011) (describing the presumption as a "clear statement requirement"), and *Menominee Tribe of Indians v. United States*, 391 U.S. 404, 406 n. 2 (1968) (ambiguous treaty provision survived a later-enacted statute of general scope).

alone an intention to abrogate them." *Id.* at 236. Because Congress did not mention abrogating "any existing international agreement" (or words to that effect) in the legislative history, the court refused to "presume the Act repudiates the executive agreements with Mexico and Canada *sub silentio*." *Id.* at 236.[11]

TRIA's legislative history also does not mention international agreements or non-FSIA immunities, let alone an intention to abrogate them. *See* H. Rept. 107-300 and H. Rept. 107-779 (Conference Report) - TERRORISM RISK PROTECTION ACT, 107th Congress (2001-2002).[12] Rather, the purpose of TRIA was to eliminate specific *FSIA-created* immunities for sovereigns and their property to enable terrorism victims to access particular "blocked assets." H. Rept. 107-779, p. 27 ("Section 201 builds upon and extends the principles in section 1610(f)(1) of the [FSIA] (28 U.S.C. § 1610(f)(1)), authorizes the enforcement of judgments against terrorist organizations and eliminates the effect of any Presidential waiver issued prior to the date of enactment purporting to bar or restrict enforcement of such judgments, thereby making clear that all such judgments are enforceable against any assets or property under any authorities referenced in Section 1610(f)(1).").

---

[11] The D.C. Circuit noted that earlier precedent could be interpreted as holding that efforts to harmonize international agreements and later-enacted statutes should be undertaken only if the statute is ambiguous. *OOIDA*, 724 F.3d at 235. But it reconciled those cases, noting that they used the term "ambiguous" more broadly to include situations when the legislative history (rather than the plain text) was ambiguous. *Id.* at 236 ("when dealing with the presumption against implicit abrogation of international agreements, many of the older cases employed the more capacious concept" of ambiguity).

[12] House Report 107-300 is available at www.congress.gov/congressional-report/107th-congress/house-report/300 (last accessed December 1, 2021) and House Report 107-779 is available at https://www.congress.gov/107/crpt/hrpt779/CRPT-107hrpt779.pdf (last accessed December 1, 2021).

The Supreme Court explained that the purpose of the "notwithstanding" clause, as revealed by the legislative history, was to eliminate Presidential waiver authority that existed under FSIA section 1610(f): TRIA's "history suggests that Congress placed the 'notwithstanding' clause in § 201(a) … to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment. H.R. Conf. Rep. No. 107–779, at 27, U.S.Code Cong. & Admin.News 2002, pp. 1430, 1434." *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009).

The D.C. Circuit elaborated on this history, noting that before TRIA, FSIA § 1610(f)(1) "purportedly allowed creditors holding judgments under § 1605(a)(7) … to attach blocked property," but "the President was authorized to 'waive any provision' of § 1610(f)(1) 'in the interest of national security.' 28 U.S.C. § 1610(f)(3)." *Heiser v. Islamic Republic of Iran*, 735 F.3d 934, 939 (D.C. Cir. 2013). Because "[t]he President waived § 1610(f)(1) in almost all cases after finding that attachment of blocked property would 'impede the ability of the President to conduct foreign policy,'" Congress "responded to this perceived 'flaunting [flouting of?] the law,' 148 Cong. Rec. 23,121 (Nov. 19, 2002) (statement of Sen. Harkin), by passing § 201, which 'builds upon and extends the principles in section 1610(f)(1) ... and eliminates the effects of any Presidential waiver issued prior to the date of enactment.'" *Heiser*, 735 F.3d at 939 (quoting H.R.Rep. No. 107–779, at 27). In other words, TRIA lifted execution immunity for "blocked assets" of terrorist states "notwithstanding" the Presidential waiver in section 1610(f)(3).

As dictated by *OOIDA*, 724 F.3d at 237, the Court cannot infer from this legislative history (and the legislative silence about non-FSIA immunity) that Congress intended to dismantle the longstanding, independent immunity of the Fund, which has its source in an

international agreement (the Articles) and enshrined in enabling legislation (the BWAA) since World War II—especially when doing so would impede the functioning of the Fund and risk putting the United States out of compliance with its obligations under Article IX, Section 10. *See, e.g.*, *Roeder II*, 646 F.3d at 62 (applying "clear statement rule" to conclude that FSIA's 2008 amendments adding private right of action against foreign states for state sponsorship of terrorism did "not abrogate[] the Algiers Accords," an executive agreement between the United States and Iran); *Roeder I*, 333 F.3d at 237 ("no clear expression in anything Congress enacted [in 2002 FSIA amendments] abrogating the Algiers Accords").

TRIA's use of the term "notwithstanding any other provision of law" cannot constitute a "clear and overt indication from Congress" that it intended to abrogate the Articles and BWAA, given: TRIA's placement within the FSIA; its stated purpose of targeting the FSIA execution immunity of sovereign property and overriding Presidential waiver authority under § 1610(f)(3); TRIA's legislative silence about abrogation of the Fund's immunity; the "international discord" that would result from such an abrogation (*OOIDA*, 724 F.3d at 236); and the fact that, even after TRIA's enactment, the Supreme Court and the D.C. Circuit both held that the Fund's immunity is absolute absent express waiver. *Jam*, 139 S. Ct. at 771–72; *Nyambal*, 772 F.3d at 281.[13]

*b.*      Independent of the "clear statement rule," other statutory construction principles support the conclusion that Congress did not abrogate the Fund's immunity *sub silentio*. As a general matter, "'[R]epeals by implication are not favored' and will not be presumed unless the

---

[13] Plaintiffs cannot rely on TRIA's "in every case" clause (DE 20, p. 11) for similar reasons. Nor does the clause show an intent to abrogate other immunities. Rather, it simply makes clear that execution immunity is removed for all cases in which a judgment is obtained: "in every case in which a person has obtained a judgment against a terrorist party … the blocked assets of that terrorist party … shall be subject to execution … in order to satisfy such judgment…." 28 U.S.C. § 1610, note.

'intention of the legislature to repeal [is] clear and manifest.'" *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007) (alterations in original). The rule applies with particular force here: implicit abrogation of the BWAA would cause the U.S. to violate the Fund's Articles, a multilateral agreement to which the U.S. is a party. *United States v. Ballestas*, 795 F.3d 138, 144 (D.C. Cir. 2015) ("'an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains.'" (*quoting Murray v. Schooner Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804))).

The more reasonable construction is that TRIA overrides attachment immunity for the blocked assets of a sovereign and its agents (28 U.S.C. § 1610, note), but does not purport to abrogate the separate jurisdictional immunity held by the Fund, which has its source in the Articles and the BWAA, 22 U.S.C. § 286h. Because these provisions can be so reconciled, this Court may—indeed, must—give effect to both. *Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.").

In sum, Plaintiffs place more weight on the "notwithstanding" clause than it can bear. There is no conflict between, on the one hand, *the Fund* possessing judicial immunity under the Articles and BWAA, and, on the other, *the blocked assets* of sovereigns and their agents having no attachment immunity under TRIA. That the Fund's absolute immunity has the incidental effect of removing the targeted SDRs—which, moreover, are not private assets that can be

confiscated and given to individuals—from Plaintiffs' reach in this proceeding does not mean

TRIA trumps the BWAA.[14]

      **D.**      **Plaintiffs' cursory argument about the validity of service fails.**

The Fund's absolute judicial immunity dispenses with any need for the Court to consider

the validity of service. DE 14-1, pp. 11-13; *Garcia v. Sebelius*, 919 F. Supp. 2d 43, 46 (D.D.C.

2013). Even if the Court were to consider the issue, as the Fund explained, Plaintiffs failed to

meet their burden to establish proper service, the writ never having made it past the security

company hired by the Fund to protect Fund Headquarters. DE 14-1, pp. 11-13.

In their opposition, Plaintiffs relegate the service question to a single footnote. DE 20, p.

8 n.4. They simply assert that "the method of service was clearly appropriate," then fault the

Fund for not doing more to challenge their inadequate service. *Id.* But because Plaintiffs never

served the Fund, it never officially became a party to this case and did not have to respond. DE

14-1, pp. 12-13; *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999).

The Fund's absolute judicial immunity further absolved it of any obligation to participate

in the judicial process, *Nyambal*, 772 F.3d at 280–81. *See e.g. Wyatt v. Syrian Arab Republic*, 83

F. Supp. 3d 192, 194 (D.D.C. 2015) ("the Court is obligated to determine—sua sponte if

---

[14] Finally, even if there were a conflict between TRIA and the Fund's immunity under the Articles of Agreement, the Articles control. The "FSIA in its entirety is subject to such [previously executed] international agreements." *Moore v. United Kingdom*, 384 F.3d 1079, 1084 (9th Cir. 2004). Under this so-called "treaty exception," "[i]f there is a conflict between the FSIA and such an agreement regarding the availability of a judicial remedy against a contracting state, the agreement prevails," regardless of whether that "leads to more or less immunity" than provided for under the FSIA. *Id.*; *de Csepel v. Republic of Hungary*, 714 F.3d 591, 601–03 (D.C. Cir. 2013)(same*); 767 Third Ave. Assocs. v. Permanent Mission of Republic of Zaire to United Nations*, 988 F.2d 295, 297 (2d Cir. 1993) (resolving direct conflict between FSIA and treaty in favor of enforcing treaty). Thus, TRIA, being a later-in-time enactment, is subject to pre-existing international agreements such as the Articles of Agreement.

necessary—whether an exception to immunity applies") (internal quotations omitted). Plaintiffs cannot use the Fund's immunity shield as a sword, by faulting the Fund for not subjecting itself to the judicial process even *more* than it has already done.[15]

## III.  CONCLUSION

Because the Fund enjoys absolute immunity from this garnishment proceeding, the Court should dismiss the case against the Fund for lack of subject matter jurisdiction, and grant such other relief as the Court deems just and appropriate.

### CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2021, the foregoing document was filed with the Clerk of the Court and served through the Court's ECF system which provided automatic service upon all counsel of record.

*/s/ James R. Newland*
James R. Newland

---

[15] The Fund, of course, appears specially to assert its immunity and its appearance cannot be construed as a waiver of its immunity.